240

**COMMUNICATION EQUIPMENT WORKERS, INC.**

v.

**WESTERN ELECTRIC COMPANY, Inc.**

Civ. No. 20421.

United States District Court,
D. Maryland.

June 17, 1971.

Henry Mayer and Mayer, Weiner & Mayer, New York City, and Harry Goldman, Jr., Baltimore, Md., for plaintiff.

Robert A. Levitt, New York City, and Leonard E. Cohen and Frank, Bernstein, Conaway & Goldman, Baltimore, Md., for defendant.

HARVEY, District Judge:

In this contract action, a union is suing an employer seeking damages and other relief on behalf of certain employees for the alleged breach of a contract between the parties.

This suit is brought under § 301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185. Plaintiff, Communication Equipment Workers, Inc. (the Union), is the exclusive bargaining representative of the employees of the defendant, Western Electric Company, Inc. (the Company), at its Point Breeze plant in Baltimore, Maryland. During the period of the matters in suit, there were various agreements entered into between the Union and the Company covering wages, hours and other terms and conditions of employment for hourly-rated, non-supervisory employees at the plant. The Union here seeks damages and specific performance of the contract in question because of the alleged failure of the Company to live up to an agreement that purportedly covered certain employees known as phenolic molding machine operators.

At the trial, a number of employees and union officials testified, as did various representatives of the Company, and numerous documents were admitted in evidence. At the request of the Court, the parties subsequent to trial filed proposed findings of fact and conclusions of law. This Court's findings of fact and conclusions of law under Rule 52(a) of the Federal Rules of Civil Procedure are embodied in this opinion, whether or not expressly so characterized.

*Facts*

As an inducement to its employees beyond their regular hourly wages, Western Electric Company for many years has maintained a wage incentive program whereby employees in various job classifications are paid additional wages when their production output exceeds that expected of the average worker. An expected hourly output (or EHO) was assigned for each machine included in the program, and employees who exceeded such output were permitted to earn up to 125% of their base pay. Those employees classified as phenolic molding machine operators have been included under this wage incentive program since at least 1961.

Western Electric Company's wage incentive program has been in effect since the end of World War II. By 1961, it became apparent that the program was not operating as originally planned. Although Company engineers had over the years developed improved methods of manufacture, the EHO for the various machines in the program had never been changed. As a result, on certain older jobs an employee could make more money doing less work than could an employee on a newer job with a more up-to-date EHO. The Company thereupon undertook to increase the EHO of a number of different jobs to take into consideration the changes in the conditions of manufacture that had crept into the wage incentive program. To compensate for the loss of earnings which would result to certain employees when a new EHO was calculated and assigned, the parties by a written instrument dated April 24, 1964, agreed that certain sums were to be paid to those employees affected by the changes.[1] The supplementary payments were to be the sum of two rates which

---

[1] Besides negotiating and signing comprehensive 3-year collective bargaining agreements, the parties from time to time would enter into supplementary agreements covering particular issues that might arise. The present dispute involves an interpretation of the Supplementary Agreement dated April 24, 1964.

were designated in the agreement as "Supplemental Rate A" and "Supplemental Rate B." It is conceded that phenolic molding machine operators qualified for and received the payments provided for as "Supplemental Rate A." The dispute in this case is whether these employees were likewise entitled to receive the payments included in the agreement as "Supplemental Rate B." Paragraph 2.2 of the Supplementary Agreement provides in pertinent part as follows:

" 'Supplemental Rate B' shall be the amount, expressed in cents per hour, for each employee that represents the inflation, if any, that is to be removed from the WAGE INCENTIVE RATES for the employee's Operating Pay Group * * * as of April 27, 1964."

The word "inflation" in Paragraph 2.2 was not defined in the Supplementary Agreement or in any of the other pertinent documents in evidence. The parties agree, however, that this word was used in its more general sense, and one of the issues in this case is what the parties in fact intended by including this term in the Supplementary Agreement of April 24, 1964.[2]

A phenolic molding machine operator produces a protective plastic part, which is designed to protect telephone wires which enter homes from occasional stray high voltage such as that which might be produced by lightning. This part is manufactured from a bakelite plastic compound which is inserted into an automatic molding press. Company specifications provide for one full cycle of the press every 80 seconds. If an experienced operator complied with the requirements of such specifications, he could produce at most 1400 parts per hour, enabling him to earn approximately 125% of his base pay. Under the Com-

pany's wage incentive program for phenolic molding machine operators, this was the maximum that these employees were supposed to earn under the EHO assigned for their machines when operated in accordance with Company specifications.

No payments were made to phenolic molding machine operators as "Supplemental Rate B" nor was there any demand on the Company for such payments during 1964. In January, 1965, however, a dispute arose between the Company and these employees. It appeared that a number of experienced operators were producing between 1600 and 1800 parts per hour, thus enabling them to earn up to a maximum of 133.9% of their base pay. These operators were able to achieve this result by a process known as short-cycling. They were able to produce more parts by removing the plastic compounds from the molding press before the 80 second time cycle was complete. This short-cycling was accomplished by means of manually operating the machine.[3] The Company put a stop to this practice by installing locks on the molding presses, thereby preventing the operators from manually manipulating the specified time cycle. As a result, it became impossible for these employees to earn more than 125% of their base pay, which as indicated was the maximum figure planned by the Company for this group under its wage incentive program.

Because of the decreased earnings resulting to these employees from the placing of the locks on their machines, discussions were initiated between Union and Company representatives to determine if something could be done to help the employees adjust to this loss in pay. As a result of these discussions, the Company offered and the Union ac-

---

2.  Webster's Third New International Dictionary gives two meanings for the word inflation, "1: an act of inflating or state of being inflated", and "2: an increase in the volume of money and credit relative to available goods resulting in a substantial and continuing rise in the gen-

eral price level." It is the first meaning that is involved in this case.

3.  According to the testimony, a broomstick was ordinarily used to reach the button that would manually operate the machine.

cepted a so-called "cushioning agreement" which was entered into on March 5, 1965, and which was designed to provide the employees involved with extra payments so as to lessen the impact of the decreased wages. Thereafter, on June 3, 1966, the cushioning agreement was revised to give a more favorable allowance to the employees over a shorter period of time. Final payments under the cushioning agreement were made by January 31, 1967.

The Union thereupon instituted grievance procedures claiming (1) that the phenolic molding machine operators group was covered by the Supplementary Agreement of April 24, 1964; (2) that the installation of the locks on the machines in 1965 constituted the removal of inflation under that Agreement; and (3) that the Company was obligated to pay the employees in this group the amounts required as "Supplemental Rate B" under the Agreement. The Union's claim was finally denied by the Company on November 12, 1968, and this suit was thereupon filed on February 4, 1969. As relief, the Union first seeks money damages on behalf of every phenolic molding machine operator from March 1, 1965 to date, measured by the formula included as "Supplemental Rate B" in the Agreement of April 24, 1964. The Union also seeks an order from this Court requiring the Company to specifically perform its obligations under Paragraph 2.2 of such Agreement by increasing the EHO for phenolic molding machines from 1400 to 1600 units, by permanently removing the locks from the machines, by allowing the operators to short-cycle and by increasing the wages hereafter paid to such operators.

In defending this action, the Company contends (1) that it did not breach the Supplemental Agreement of April 24, 1964 either in that year or when locks were placed upon the machines in 1965; (2) that the Union's claim has been discharged by accord and satisfaction; and (3) that this suit is barred by limitations. This Court has concluded that the first two issues which go to the merits of the controversy should be resolved in favor of the Company. It is therefore not necessary to decide the question of limitations that has also been raised.

### The Alleged Breach of Contract

There can be little doubt that the purpose of the Supplemental Agreement of April 24, 1964 was to permit equalizing revisions to be made in the wage incentive plan without causing drastic pay losses to those employees who for years had been receiving the benefits of the plan as originally devised. For want of a better term, the process of revising the plan was referred to as removing "inflation" from the wage incentive rates. However, all pay groups within the plant were not affected by the supplemental agreement. As to some of such groups, no revisions at all were made, no new EHO's were calculated and there was therefore no loss of pay to the employees involved.

It is clear from the evidence in this case that the phenolic molding machine operators group was *not* one of those operating groups entitled to receive "Supplemental Rate B" payments under the Agreement of April 24, 1964. No new EHO was calculated at this time for their machines, and therefore phenolic molding machine operators suffered no loss in pay in 1964. As no "inflation" was removed from the wage incentive rate applicable to them, there was no need for the phenolic molding group to receive "Supplemental Rate B" payments, and in fact they received none. No demand for such compensatory payments was made by the Union at any time during 1964 because quite clearly no one thought that this group was included under Paragraph 2.2 of the Agreement.

The Union argues that it was the Company's duty in 1964 to remove "inflation" from the wage incentive rates of the phenolic molding machine operators by increasing the job's EHO from 1400 units to 1600 units. Of course, if this revision had been made, the phenolic group would indeed have been entitled

to additional payments under the Supplemental Agreement. But there is nothing in the Agreement itself even remotely suggesting such a duty on the part of the Company. Furthermore, the evidence clearly establishes that during the negotiations which led to the 1964 Supplementary Agreement, the Union and the Company agreed upon the designation of those groups which would have inflation removed from their rates as of April 27, 1964 and that phenolic molding machine operators were not included as one of those groups. Indeed, in advance of the signing of the Supplementary Agreement, the parties specified the amount of the supplement that each pay group would receive under the Agreement, and no supplement was designated for the phenolic group. Under the evidence therefore, this Court concludes that the phenolic group was not intended to be covered by Paragraph 2.2 of the Supplementary Agreement.

Nor does the evidence support the Union's construction of the term "inflation" as used in the Agreement. As understood by the parties when the Supplementary Agreement was signed, "inflation" existed when changes in the conditions of manufacture specified by the Company's engineers warranted an increase in the EHO upon which the original incentive rate had been calculated. In order to remove "inflation" then, it was necessary to establish a new incentive rate based upon current specified conditions of manufacture by assigning a new increased EHO. The disparities in the Company's wage incentive program had gradually evolved over the years as Company engineers had improved the conditions of manufacture and had changed the specifications for the job making it possible for employees to manufacture more parts in less time. Although changes had been made in the conditions of manufacture for these jobs over the years, no changes had been made in the various EHO's. Therefore, on some of the older jobs an employee could receive the full benefit of the wage incentive program by doing less work than

was required of an employee on a newer job with a more up-to-date EHO. Both Union and Company representatives agreed that such disparities in the program were unfair.

Insofar as the phenolic molding group was concerned, however, there had been *no* change in the specified conditions of manufacture during the period in question. The short-cycling which occurred and which enabled phenolic molding machine operators to earn in excess of the amount specified in the plan for this group was *not* permitted by Company specifications. Therefore, when the Company placed locks on the phenolic molding machines which prevented the operators from short-cycling and which thereby also prevented them from earning sums in excess of that permitted by the wage incentive program, the Company was not removing "inflation." It was merely insisting that its employees comply with the specifications that had been prepared by Company engineers for the product being manufactured.

■ From the evidence, this Court finds that short-cycling produced an inferior product. Specifications for phenolic molding required at the time of the matters in suit and still require that the plastic compound be inserted into the molding press for a full 80 seconds. The testimony indicates that an operator by increasing the heat might be able to produce an acceptable product even if the compound were removed before the expiration of 80 seconds. However, it is also quite clear that parts produced in this manner would lack uniformity and that many more inferior parts would result from such a hit-or-miss operation than would be the case if controlled conditions of manufacture were used, including a uniform time cycle and uniform heat.

The Union argues that the Company authorized or condoned the short-cycling and that it became an accepted condition of manufacture for this particular product. The testimony that Company supervisors had knowledge of the short-cycling is conflicting. At various times,

management took steps to stop this unauthorized practice, and when other efforts proved unsuccessful, locks were finally placed on the machines. Even assuming that many of the supervisors knew that certain employees were using short-cycling practices to increase their production output and that proper steps were not taken to halt such practices, it is clear from the evidence that such a method of manufacture was never incorporated in the specifications. The specified cycle time was never changed, and the Company was therefore entirely justified in placing locks on the machines in 1965 to prevent employees from using methods which had not been approved by Company engineers and which sacrificed quality for quantity.

For these reasons, this Court concludes that the Company did not breach its agreement with the Union either in 1964 or in 1965. The Company was under no duty on April 27, 1964 to remove "inflation" from the wage incentive rates for the phenolic molding machine operators group because this group was not one of those covered by that portion of the Agreement. Nor was it a breach of the 1964 Agreement when the Company in March, 1965 installed locks on the phenolic molding machines to prevent deviations from Company specifications.

The Union's claim, which arose several years after the 1964 Supplementary Agreement and because of an event unrelated thereto, was no more than an after-thought.

### Accord and Satisfaction

█ The evidence in this case further shows that whatever claim against the Company for additional wages the phenolic molding group may have had in 1965, such claim was extinguished when the parties entered into the so-called "cushioning agreement" on March 5, 1965. Under the doctrine of accord and satisfaction, the Union's claim was discharged when this agreement was reached and when the compensatory payments required thereunder were made to the phenolic molding machine operators.

See 6 Corbin on Contracts, §§ 1276–1292 (1962).

The present dispute between these employees and the Company did not arise until January, 1965 when locks were put on the machines. No claim against the Company had theretofore been made by or on behalf of the phenolic group because, until then, there had been no loss of earnings by these employees. It was quite obvious to the Company that the phenolic molding machine operators would be dissatisfied with the decrease in the amount of incentive payments they would receive when the machines were locked, and in early 1965 negotiations were undertaken with the Union to see if this problem could be resolved. Following discussions between Mr. Buckler, the Department Chief for the phenolic molding group, and Mr. Moland, the Union Piece Rate Committee Chairman, an agreement was reached on March 5, 1965 whereby in each of 31 consecutive months a decreasing amount would be added to the earnings of these employees. On June 3, 1966, the original cushioning plan was superseded by a revised plan which increased the amounts of the payments but called for a shorter period of time for the payments to be made. All of the payments required under the original and revised cushioning agreement were made by January 31, 1967.

█ Whether a claim is well founded or not, the acceptance by the claimant of lesser amounts than what is claimed to be due fully satisfies the claim. 6 Corbin on Contracts, § 1276, p. 115. In the present case, the executory contract entered into by the parties in satisfaction of the claim of the employees has been fully satisfied. Indeed, the Union waited until all of the supplementary payments had been made by the Company before bringing suit claiming that the employees are entitled to more.

The Union argues that the cushioning agreement was offered in settlement of the employees' grievance concerning loss of pay because of the use of locks, not in settlement of the breach of contract claim. But the record shows that this is

one and the same claim. There can be little doubt that the present dispute arose only when the locks were installed on the machines. Indeed, it has consistently been the Union's position that the locking of the machines by the Company without making compensatory payments was a breach of the Supplementary Agreement, and as a part of the relief claimed, the Union asks this Court to order removal of the locks. The claim settled pursuant to the cushioning agreement and the claim sued upon here are therefore essentially one and the same, namely, a claim for payments by the Company to compensate these employees for the decrease in their earnings resulting from the placing of locks on their machines. Clearly, both parties understood in 1965 that it was this claim which was being settled. Therefore, even if it were to be assumed in this case that the Union had a valid claim against the Company on behalf of the phenolic molding machine operators, such claim was fully discharged when the Company paid these employees the amounts required under the cushioning agreement.

For these reasons, judgment is hereby entered in favor of the defendant with costs.