LOCAL 461 AND DISTRICT III OF the INTERNATIONAL UNION OF ELECTRICAL, RADIO AND MACHINE WORKERS, AFL–CIO, and Joseph DiBella, Thomas Murray, Francis Gibbons, Mel Blumenthal, George McLaughlin, Joseph DiBernardino and Joseph Krasinski, in their individual and representative capacities on behalf of all similarly situated Singer Workers, and Honorable Raymond Lesniak, in his capacity as Assemblyman representing the 20th Assembly District in the New Jersey General Assembly, Plaintiffs,

v.

The SINGER COMPANY, Defendant.

Civ. A. No. 82–940.

United States District Court,
D. New Jersey.

May 21, 1982.

Ordered July 8, 1982.

the agreement by investing $2 million to restructure the plant and by using best efforts to keep the plant open, at least in part by securing defense contract work to supplement the manufacture of sewing machines. Plaintiffs claim that Singer has neither spent the $2 million nor used best efforts to secure defense work. Plaintiffs bring this action pursuant to section 301 of the National Labor Relations Act, 29 U.S.C. § 185, alleging that Singer has thereby breached its collective bargaining agreement with Local 461 of the International Union of Electrical, Radio and Machine Workers, AFL–CIO ("Local 461"). Plaintiffs, seeking specific performance of the agreement, ask the Court to enter a preliminary and permanent injunction restraining defendant from taking any steps to close the Elizabeth facility during the term of the contract or, at least, until Singer fulfills its contractual obligations. In addition, plaintiffs seek damages for defendant's alleged breach.

Weiner, Staubach, Edelson & Hopmayer by Lester Weiner, Roselle Park, N. J., and Lewis, Greenwald & Kennedy, P. C. by Everett E. Lewis, and Thomas Kennedy, New York City, for plaintiffs.

Greenberg, Dauber & Epstein by Edward J. Dauber, Newark, N. J., and Jackson, Lewis, Schnitzler & Krupman by Gregory I. Rasin, and Robert Lewis, New York City, for defendant.

## OPINION

STERN, District Judge.

The Singer Company has announced its intention to close its sewing machine manufacturing facility in Elizabeth, New Jersey by the end of 1982. The company's employees now sue to compel Singer to keep the plant open. Plaintiffs contend that in exchange for millions of dollars in union "give-backs," the company agreed to keep the Elizabeth facility open for the length of

It is Singer's contention that the collective bargaining agreement imposes *no* obligation on the company to stay in business. Singer argues that while it was obligated to spend $2 million to restructure the Elizabeth plant to make it more efficient, it at no time surrendered what it characterizes as the prerogative of any company to go out of business when it so desires. Singer argues, in addition, that alti ough it has admittedly breached its contract by failing to spend the $2 million, it should be excused from the payment of any damages because performance under the contract became impracticable by November 1981, less than five months after it was signed, due to an unexpected and severe decline in market demand. In other words, Singer wishes to close this plant and walk away from the situation, without incurring any damages, despite the fact that it has operated the Elizabeth plant since May 1981 with the benefit of substantial union "give-backs" that were extracted on the basis of promises which have now been breached.

The Court finds that the agreement, which is clear and unambiguous, contains

no promise that Singer will refrain from discontinuing operations in Elizabeth. Therefore the Court will not enter an injunction restraining defendant from closing the plant if it chooses to do so. On the other hand, the Court finds that within a few short months after the agreement had been signed, and after having extracted substantial "give-backs" from its employees, Singer breached a clearcut obligation both to spend $2 million to restructure the plant and to use its best efforts to secure defense contracts and otherwise maintain the facility as a viable economic entity. Accordingly, although the Court will not compel Singer to stay in business, we will not permit a company in clear breach of its collective bargaining agreement to escape its responsibility to answer in damages. Instead, the Court will award plaintiffs monetary damages in an amount to be measured either by the value of the union "give-backs," which will be determined at trial, or by the $2 million Singer promised, but failed, to spend, whichever is greater.

## FACTS

The plaintiffs in this action are Local 461, the collective bargaining representative for the workers employed by defendant Singer at the Elizabeth facility; District III of the International Union of Electrical, Radio and Machine Workers, a regional organization representing union members in the New Jersey-New York area including those workers who are members of Local 461; several named officers and members of Local 461; and New Jersey State Assemblyman Raymond Lesniak, who represents the district in which the Singer plant is located.[1]

Defendant Singer's Elizabeth facility, which occupies some 1.4 million square feet, houses industrial sewing machine and sewing machine parts manufacturing operations and offices for various marketing and miscellaneous administrative activities. Singer has maintained operations in Elizabeth since 1877 and Local 461 has represented the Singer employees at this location since 1949. At its peak, the facility employed approximately 10,000 employees. According to defendant, as recently as 1973 about 300,000 industrial and consumer sewing machines were produced at Elizabeth, of which 24,000 were industrial. At that time, the plant employed 3,500 employees. By January 1980, due to decreased consumer demand, increased competition, particularly from foreign sources, and the transfer of a percentage of Singer's manufacturing activities overseas, the Elizabeth workforce had been reduced by more than half to 1,530 employees. Later that year, the company announced that it was discontinuing the manufacture of *consumer* products at Elizabeth. Since that announcement, the number of employees at the plant, now devoted exclusively to the manufacture of industrial machines, has steadily declined.

With all sides recognizing that the viability of the plant was in jeopardy, the parties entered negotiations in the spring of 1981 aimed at reaching a new collective bargaining agreement. On June 21, 1981, after having extended the deadline on contract talks by mutual consent, the company and Local 461 entered into a Memorandum of Agreement modifying and extending the previous collective bargaining agreement between the parties. That contract, which is the subject of this lawsuit, was effective May 10, 1981 and expires on May 14, 1984.

According to Singer, when the negotiations commenced, the bargaining unit consisted of 721 employees. By May 9, 1981, the expiration date of the old agreement, that number had shrunk to 673, and by June 21, 1981, the date the new contract

1. Plaintiff Lesniak has asserted state law claims in Counts 3 and 4 of the complaint on behalf of the community of Elizabeth, New Jersey on the theory that the residents of the community are third-party beneficiaries of the collective bargaining agreement and that the community has a property interest in the continued vitality of the Singer plant. Count 5 of the complaint attempts to state a claim on behalf of the plant employees under the New Jersey statutes which prohibit discrimination on the basis of age. The Court has not as yet addressed the merits of these claims, but has expressed serious doubts as to their validity. Tr. of Mar. 26, 1982 at 31; Tr. of May 14, 1982 at 32.

was agreed upon, it had shrunk still further to 598. The company claims that, as of the date of this decision, what was at its peak a workforce of over 10,000 has shriveled to about 400.

The June 21st Memorandum of Agreement included the following clause, Appendix Z, upon which plaintiffs' claims are primarily based:

> During the negotiations which led to this agreement it was mutually recognized that every effort should be made by both the Company and the Union to improve the productivity of the plant.

> Accordingly, the Company will invest two million dollars ($2,000,000) in restructuring the facility to make more efficient the production facilities for the manufacture of industrial sewing machines. The Company will within 30 days initiate the necessary procedures to implement the restructuring plan.

> In addition, the Company will continue to devote emphasized attention to the procurement of defense work compatible with the plant's machine shop capabilities and has the potential for profitability. Such work would be incremental to the Company's principal mission which is to produce a competitive sewing machine. In this connection, Secretary of Defense Weinberger stated that he and the Defense Department will do everything in their power within the limits of the law to assist The Singer Company in securing such Federal work for the Elizabeth plant.

Plaintiffs contend that in order to extract the commitments on the part of the company contained in Appendix Z, the union was forced to agree to certain "give-backs." There is a factual dispute as to which concessions agreed to by the union should be considered "give-backs" and as to how the "give-backs" should be valued. Both sides agree, however, that at a minimum the "give-backs" include: the elimination of two floating paid holidays per year; the elimination of two ten-minute rest periods per day; a decrease from ten to seven in the number of hours paid for by the company that shop stewards could devote to union business; and certain changes in incentive standards to reduce production costs and increase productivity. The Singer Company prepared a document at the conclusion of the negotiations in which it estimated the value of these "give-backs" to the company over the term of the agreement, calculated on the basis of a 721-member bargaining unit, as $1,853,000. It is unclear whether plaintiffs agree with the company's valuation of these "give-backs."

The parties also agree that the reduction of pension benefits by permitting the offset of workers compensation benefits should be included among the "give-backs." Neither side has put a precise monetary value on this factor, but plaintiffs have indicated that it would result in substantial savings to Singer, perhaps in the millions of dollars, while defendant argues that the figure is negligible.

Finally, the union contends that it accepted a 5% wage increase for the first year of the agreement while the average negotiated wage settlement for industrial workers was 9% in 1981 and that the 4% differential should be categorized as a "give-back." The company responds that any wage increase, even one lower than may have prevailed among other industrial workers, should not be counted as a "give-back." Singer argues, moreover, that the agreement provided overall for incre.ased pension benefits and that both the wage and pension increases more than offset the "give-backs" valued at $1.8 million.

A determination as to which items should be included as "give-backs" and a valuation of those "give-backs" must await trial. At this point, it is clear, however, that as part of the collective bargaining agreement, the union tendered at least $1.8 million in "give-backs."

Singer contends that its decision to enter into a new collective bargaining agreement and to attempt to maintain the Elizabeth facility as a viable economic unit was based on certain economic assumptions contained in a market forecast study it had conducted in April 1981. That study projected the

demand for industrial sewing machines to be produced at Elizabeth as follows:

| Year | Units |
|------|-------|
| 1981 | 9,500 |
| 1982 | 11,100 |
| 1983 | 12,500 |

After the June 21st agreement was entered into, Singer conducted another study and allegedly discovered that market demand had eroded sharply. The forecast dated October 1981 showed the following projections of worldwide demand for Elizabeth products:

| Year | Units |
|------|-------|
| 1982 | 5,000 |
| 1983 | 5,000 |

Singer contends that the situation has grown bleaker still in the intervening months and estimates that at present only 2,500 units will be demanded in 1982. At that severely reduced level of production, Singer alleges that it would be required to terminate a significant number of the 400 workers remaining in the bargaining unit.

In November 1981, only five months after the agreement had been reached, Singer reached an internal decision to consider closing the plant. At the same time, Singer abandoned any efforts it may have undertaken to restructure the plant. There is no doubt that while Singer may have expended a minimal amount of the $2 million before November 1981, not a penny has been expended since then.[2] Similarly, all efforts aimed at securing defense work ceased in November. The "give-backs" of the employees, of course, continued unabated. Despite the fact that company officials allegedly discussed the alternatives to a plant closing with representatives of the union at various times during the months of November and December 1981, and January and February 1982, it was clear that the result was a *fait accompli*. By reneging in November on its agreement to restructure the plant by expending $2 million and to use best efforts to obtain defense work, Singer sealed the fate of the Elizabeth facility. On February 11, 1982, Singer officially announced that it would close the plant by the end of 1982.

On March 26, 1982, plaintiffs filed this lawsuit and sought the entry of a temporary restraining order preventing defendant from closing the plant or from further dismantling the facility so as to thwart the efficacy of any future ruling of this Court. Plaintiffs alleged that defendant had scheduled an auction in April 1982 of thousands of machine tools necessary to operations at the Elizabeth plant. The Court denied plaintiffs' application for a temporary restraining order both because it did not appear that the company planned to make any material changes within ten days, the maximum duration of such a restraint, and because Singer agreed not to change the status quo until this Court ruled on plaintiffs' application for a preliminary injunction. The Court instructed the parties to submit briefs on certain specific issues and a return date for the preliminary injunction hearing was set. On May 14, 1982, the Court heard argument on plaintiffs' application for preliminary injunctive relief.

## DISCUSSION

### I. Consideration of Parol Evidence

In order to determine whether the collective bargaining agreement obligates Singer to keep the Elizabeth plant open, this Court must first decide whether it is restricted solely to consideration of the contract itself or whether it is permitted to consider parol or extrinsic evidence concerning the negotiations leading up to the signing of the agreement and the expectations of the parties.

■ The law in this Circuit is quite clear that the introduction of parol or extrinsic evidence to aid in the interpretation of a contract is prohibited unless the contract is

---

**2.** Singer contends that it spent $130,000 prior to November 1981. Plaintiffs dispute this contention and allege that a representative of the company stated that any money spent would be in an effort to avoid litigation. *See* Aff. of Joseph DiBella at 7.

ambiguous. *See Lewis v. Seanor Coal Co.,* 382 F.2d 437 (3rd Cir. 1967). As the court stated in *Wilkes Barre Printing Pressmen v. Great Northern Press,* 522 F.Supp. 106, 108 (M.D.Pa.1981), "[a]s a general rule, parol evidence may not be admitted to vary the provisions of an unambiguous written contract which contains all the items to which the parties agreed." There is no question, and plaintiffs agree, that the collective bargaining agreement effective May 10, 1981 is a complete and fully-integrated agreement. Therefore, parol evidence may be considered only if the Court finds that the contract is ambiguous.

■ The Third Circuit has recently set forth the standards governing a determination as to whether a contract is ambiguous. In *Mellon Bank, N. A. v. Aetna Business Credit, Inc.,* 619 F.2d 1001 (3rd Cir. 1980), the court stated

> [i]t is the role of the judge to consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning. The trial judge must then determine if a full evidentiary hearing is warranted. If a

*reasonable* alternative interpretation is suggested, even though it may be alien to the judge's linguistic experience, objective evidence in support of that interpretation should be considered by the fact finder. (Emphasis in original.)

*Id.* at 1011. The Third Circuit, then, explicitly rejects the notion that a court should determine the question of ambiguity by relying solely on an examination of the four corners of the contract. In determining whether extrinsic evidence is required, therefore, the Court must consider the arguments of counsel.

■ After having carefully examined the contract in question as a fully-integrated document and having reviewed the arguments set forth in the briefs and the affidavits that have been submitted, this Court has reached the conclusion that the contract is clear and unambiguous and that it therefore cannot consider parol evidence.[3]

## II. Requirement to Keep Plant Open

■ Plaintiffs' contention that the contract imposes an obligation on Singer to keep the Elizabeth facility open is based primarily on Appendix Z.[4] We are unable

---

**3.** Although plaintiffs argue that parol evidence will substantiate their view that the contract was intended to compel Singer to keep the plant open, they concede that the Third Circuit rule quoted above applies; that such evidence should not be considered unless the contract is deemed ambiguous; and that the contract in question is unambiguous. Plaintiffs state, for example, that a decision to exclude parol evidence "would be particularly attractive since it would open the way for summary disposition of critical contract issues and thereby obviate both costly discovery and a lengthy trial." Plaintiffs' Supplemental Memorandum of Law at 10. It is plaintiffs' view, of course, that the agreement unambiguously creates a commitment on the part of Singer to remain open. Plaintiffs further suggest that the traditional rule governing parol evidence should be relaxed in situations involving the interpretation of collective bargaining agreements. The Third Circuit expressly declined to adopt that view, however, in *Local 13, International Federation of Professional & Technical Engineers v. General Electric Co.,* 531 F.2d 1178, 1183 n.13 (3rd Cir. 1976).

**4.** Plaintiffs also rely on other provisions of the contract to support their argument. They ar-

gue that Article II, Section A indicates a promise on Singer's part to keep the plant open. That provision states:

> The inclusion of a Labor Management Productivity Improvement clause at this time constitutes a recognition by b. 'h parties that the survival of the Elizabeth Plant is dependent upon the exercise of several managerial principles designed to improve productivity and make the Company's products more competitive.
>
> Accordingly, the parties reaffirm that the Company retains the exclusive right to manage and operate its business, subject to the express provisions of this agreement. Some of the rights retained by the Company include, but are not limited to, the right to direct the workforce, maintain efficiency, improve productivity, audit work standards, establish new or improved methods, establish and enforce rules for the maintenance of discipline, and eliminate non-productive or inefficient work practices.

Plaintiffs argue that because this provision does not explicitly permit Singer to close the plant, it implies a guarantee that Singer will keep the Elizabeth plant in operation. That reading is untenable; the same argument was

to find in that provision a commitment by Singer to remain open. The provision solely provides that Singer would within 30 days of the agreement initiate a plan to restructure the plant to improve its productivity. Singer unconditionally committed itself to spend $2 million in that effort. In addition, the company agreed to "continue to devote emphasized attention to the procurement of defense work compatible with the plant's capabilities and with the potential for profitability." Certainly those are not words guaranteeing continued operations. At most, they are words requiring the company to use best efforts to stay in business. If the union had been able to wrest a guarantee of continued employment from the company, words embodying that promise would have appeared explicitly in the agreement. The union certainly knew how to write those words if it could have gotten the employer to agree to them. Without clear words to the contrary, this Court cannot find that Singer relinquished the prerogative of all employers to terminate parts of their business for economic reasons. See *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 677–79, 101 S.Ct. 2573, 2580–81, 69 L.Ed.2d 318 (1981).

rejected in *Fraser v. Magic Chef-Food Giant Markets, Inc.*, 324 F.2d 853, 856 (6th Cir. 1963), where the court held that a management rights clause which does not give management the express right to discontinue operations does not by implication deny that right.

Plaintiffs also rely on Article 10 of the agreement which provides that there shall be no lockouts. It is clear, however, that a permanent closing is not an unlawful lockout; therefore a no-lockout provision is not a guarantee of continued operations. *Hoh v. Pepsico*, 491 F.2d 556, 561 (2nd Cir. 1974).

Singer argues in response that a host of contract provisions, other than Appendix Z, represent a clear understanding that a possible closing was contemplated. The contract sets forth a schedule for the payment of severance benefits to employees separated as a result of a "layoff for lack of work." Appendix D. The contract defines a "layoff" triggering severance entitlement as any "termination of employment with the Company from a change in production or manpower requirements as determined by the Company." According to Singer, the contract's "farming out" provisions evidence further recognition of the plant's tenuous condition. Article 35 provides that "due to the drastic decline in the sewing machine market," the

At the hearing on May 14, 1982, plaintiffs conceded in the following colloquy that Appendix Z cannot be construed as a guarantee that the plant would be kept open:

THE COURT: ... They never made you a promise. Show me a word in the contract that says they will keep open . . . .

MR. LEWIS: Well, this appendix, they were committed—both sides were committed to make every effort—

THE COURT: Read the words to me.

MR. LEWIS: "Every effort to improve productivity of the plant."

THE COURT: Yes.

MR. LEWIS: And the company was to invest two million dollars in restructuring the facility to make more efficient the production facilities for the manufacture of industrial sewing machines.

THE COURT: Yes.

MR. LEWIS: And the company would continue to devote emphasized attention to the procurement of defense work compatible with the machine's capabilities.

Then they give us this stuff about Secretary of Defense Weinberger—

Company may transfer, or "farm out," work which "would necessitate the elimination of a certain amount of bargaining unit jobs." Moreover, while the collective bargaining agreement details "farming out" procedures, the parties recognized that "the existing rights of the Company to lay off employees for other reasons such as lack of work, because of reduced volume, or model discontinuance," were "not in any way limit[ed]." *Id.* The contract set a limit on the number of employees who could be laid off as a result of "farming out," but it further provided that if Singer exceeded that number the only remedy available to the union was to terminate the contract. *Id.*

These terms betray an unambiguous understanding on the part of the parties that a plant closing was clearly possible, and that additional layoffs were probable. In *Bakery and Confectionary Workers Local Union No. 12B v. Great Atlantic and Pacific Tea Co.*, 357 F.Supp. 1322, 1324 (W.D.Pa.1973), *aff'd*, 491 F.2d 748 (3rd Cir. 1974), the court found that a severance pay clause providing for pay in the event a worker is displaced as a result of plant or departmental closing constitutes a "clear-cut provision that the parties contemplated and provided for the possibility that the defendant might cease operations entirely . . . ."

THE COURT: Yes.

MR. LEWIS: Who, you know, and this whole thing, that wasn't a little thing. They made—that was a real circus.

THE COURT: Show me the words where it says they are going to stay open.

MR. LEWIS: Well, of course I say that this has to be viewed in the context, really, of the entire negotiations between the parties.

THE COURT: You are a sophisticated lawyer. This is a big time operation. If a Union could have gotten a straight promise to keep open, they would have been foolhardy not to have achieved it. They didn't get it because they couldn't get it.

MR. LEWIS: But they got the next best thing. They got a promise to use best efforts.

THE COURT: I understand, but you will then agree with me that they did not get a promise to keep open.

MR. LEWIS: I don't think we said we got a promise to keep it open. We just got a promise that they would exert their best efforts.

Accordingly, this Court finds that Appendix Z unambiguously does *not* compel Singer to stay in business; rather it represents a promise to use best efforts to keep the plant efficient, in part by devoting $2 million to restructuring it. Singer cannot and will not be compelled to remain in business against its will by this Court in the absence of *any* contractual language requiring them to do so.[5]

**5.** Plaintiffs rely heavily on the case of *United Steel Workers of America, Local 1330 v. United States Steel Corp.*, 492 F.Supp. 1 (N.D.Ohio), aff'd in part, rev'd in part, 631 F.2d 1264 (6th Cir. 1980). In that case, the district court preliminarily enjoined an employer from going out of business where plaintiffs alleged that a promise had been made that operations would be continued. Despite grave concerns about its authority, the court entered the injunction because the closing date had been moved up after the case had commenced and it was necessary to preserve the status quo in order for the court to protect its jurisdiction. The court thereafter held a prompt trial, found that no promise had been made by the employer, and vacated the

*III. Breach of Contract and the Measure of Damages*

Just as it is clear that Singer made no promise to stay in business, it is equally clear that defendant stands in breach of Appendix Z. That provision obligated the company to spend $2 million to restructure the plant and to use its best efforts to secure defense contract work and otherwise maintain the facility as a viable economic entity. In November 1981, Singer reneged on both of those commitments. Tr. of May 14, 1982 at 12–14. Indeed, Singer admits that it has breached its agreement with Local 461:

THE COURT: Did you violate this agreement or didn't you?

MR. RASIN: We did not spend the two million dollars, your Honor.

THE COURT: Does that mean yes?

MR. RASIN: Yes, it does. We breached it in that respect.

*Id.* at 9–10.

Despite its admission that it stands in breach, Singer takes the position that it owes plaintiffs nothing in damages. Defendant argues that plaintiffs are only entitled to the benefit they would have received had the $2 million been spent and best efforts employed. Singer contends that had it complied with the contract the plant would still have been forced to close in any event due to decreased market demand and that plaintiffs would have been no better off than they are now. The Court finds Singer's position to be untenable.

First of all, Singer's promises were unconditional; they were not made contingent

injunction. There is no need in this case for the Court to enter an injunction on such shaky grounds. It is already clear at this preliminary stage, as it was not to the court in *Local 1330*, that no promise to stay in business was made by Singer.

In addition, this Court will not compel specific performance of Appendix Z. To force Singer to spend $2 million on a facility it has already decided to abandon would elevate form over substance, result in a flagrant waste of economic resources, merely delay the eventual closing of the plant and, most importantly, deprive the workers of the damages to which they are entitled.

on the continuation of a particular level of market demand and Singer was well aware at the time the contract was signed that the future of the plant was extremely tenuous. It was for that very reason that Singer did not promise to keep the plant open under all circumstances.

Nevertheless Singer gave its unconditional guarantee that it would spend $2 million to restructure the plant in exchange for substantial union "give-backs." Singer has had the benefit of those "give-backs" since May 1981 and will continue to benefit from them until the plant closes at the end of 1982.

Under these circumstances, it would be grossly unfair to permit a company, which admits that it breached a three-year collective bargaining agreement within months after it had been signed, to close this facility and walk away from these workers without paying one cent in damages. Plaintiffs are entitled to money damages.

Second, it is clear that the theory upon which defendant bases its claim that damages should be totally denied is fatally flawed. Defendant would have this Court project what *might* have happened had Singer expended the $2 million and conclude that the plant would have closed in any event by the end of 1982. Singer contends that its efforts would have been in vain, but plaintiffs argue that had the money been spent and had defense work been secured the plant would have undergone a resurgence. It is plain that this Court cannot now divine through some occult device

what might have been had Singer fulfilled its obligations. This Court cannot measure damages in such a speculative manner.

The Court has determined therefore that an appropriate and ascertainable measure of damages should be either the value of the "give-backs" tendered by the union, a figure which will be determined at trial,[6] or the $2 million Singer promised to spend on the plant, whichever is greater.[7] In this way, the workers will be made whole; they will be no worse off than they would have been had they entered into a collective bargaining agreement without tendering "give-backs" and without extracting the promises contained in Appendix Z.[8]

## ORDER

It appearing that the Court's Order of May 21, 1982 did not fully reflect the Court's rulings in this matter; and the Court having determined that there is no just reason for delay and that a final judgment should be entered pursuant to Federal Rules of Civil Procedure 54(b) denying plaintiffs' claim for permanent injunctive relief; and the Court having determined for the reasons set forth in its opinion filed on May 21, 1982 that the proper measure of damages for defendant's breach of contract should be either the value of the "give-backs" tendered by plaintiff Local 461, a figure which will be determined at trial, or the $2 million which defendant promised to spend on the plant, whichever is greater; and having determined that an order to that effect involves a controlling question of law as to which there is substantial ground for difference of opinion and that

6. As has been indicated earlier, there are substantial disagreements between the parties as to what should be included under the rubric of "give-backs" and as to how the "give-backs" should be valued. These thorny questions will be resolved at trial. The Court has expressed its view, however, that the "give-backs" should be valued on the basis of the size of the bargaining unit at the time the negotiations commenced, namely, 721 employees. Singer itself calculated the value of the "give-backs" on the basis of 721 employees. Moreover, it is entirely possible that had defendant complied with the contract, those 721 employees would still be employed.

7. Singer will not receive credit for the $130,000 it claims it spent before November 1981. Because the full $2 million was not spent, the workers did not receive the benefit of their bargain.

8. After the May 14, 1982 hearing, Singer agreed to deposit with the Court $2 million as a fund from which any damages ultimately awarded could be drawn. Singer has undertaken this action without prejudice to any of its rights and it in no way signifies an admission of liability. The Court has appointed a receiver to invest the money at the most favorable rate of interest available. See Court's letter to Gregory I. Rasin, Esquire, dated May 18, 1982.

an immediate appeal from the order may materially advance the ultimate termination of the litigation; and for the reasons set forth in the Court's opinion filed on May 21, 1982,

It is on this 8th day of July, 1982,

ORDERED that the Court's Order of May 21, 1982 be, and it hereby is, vacated; and it is further

ORDERED that plaintiffs' application for a preliminary and permanent injunction be, and it hereby is, denied; and it is further

ORDERED that a final judgment be, and it hereby is, entered pursuant to Rule 54(b) with respect to plaintiffs' claim for permanent injunctive relief; and it is further

ORDERED that the measure of damages for defendant's breach of contract be, and it hereby is, the value of the "give-backs" tendered by plaintiffs, a figure which will be determined at trial, or the $2 million which defendant promised to spend on the plant, whichever is greater; and it is further

ORDERED that the Court's order with respect to the measure of damages be, and it hereby is, certified pursuant to Title 28 United States Code, § 1292(b) for immediate appeal on the question: What is the correct measure of damages for defendant's breach of contract?