**In re U.S. TRUCK COMPANY, INC., Debtor.**

**Bankruptcy No. 82–03561–R.**

United States Bankruptcy Court, E.D. Michigan.

June 9, 1987.

See also 71 B.R. 99.

Thomas Radom, Birmingham, Mich., Charles Lincoln, Little Rock, Ark., for debtor.

George Peck, Grosse Pointe, Mich., for Creditor, Central Transport.

James Hoffa, Detroit, Mich., Gerry Miller, Milwaukee, Wis., for Teamsters Negotiating Committee.

## OPINION REGARDING THE CLAIM FOR CONTRACT REJECTION DAMAGES

STEVEN W. RHODES, Bankruptcy Judge.

On December 6, 1982, the Court granted U.S. Truck's motion to reject its collective bargaining agreement with the Teamsters Union. On August 7, 1984, the Teamsters National Freight Industry Negotiating Committee (the Committee) filed an amended proof of claim (the claim) for the resulting damages. On October 26, 1984, U.S. Truck filed objections to the claim. On January 15, 1985, Central Transport Corporation, a creditor related to the debtor, joined in the debtor's objections. After discovery, a lengthy hearing was held. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rules 9014 and 7052.

After the resolution of several legal issues both before and during the hearing,[1] the following aspects of the Committee's claim are presently before the Court:

---

1. The Court's previous rulings on issues of law are as follows:

 1. Upon the debtor's motion for summary judgment, the Court held that the Committee lacks standing to assert a claim on behalf of the Michigan Conference of Teamsters Health and Welfare Fund; thus, this aspect of the claim is no longer before the Court. The Court did however sustain the Committee's standing to assert claims on behalf of the local unions and the employees.

 2. At the same time, the Court rejected the debtor's contention that the form of the Committee's proof of claim was inadequate under the Bankruptcy Rules.

 3. Shortly before the hearing, the Court refused to permit the Committee to add names to the list of employees in the claim.

 4. The Court dismissed those portions of the claim asserted on behalf of employees who had not complied with a discovery order requiring them to produce their pertinent tax returns.

 5. In denying the debtor's motion to dismiss at the conclusion of the Committee's case, upon reconsideration, the Court rejected the debtor's argument that the Committee was required to prove that the debtor would have survived in business if the collective bargaining agreement had not been rejected. The Court held that in determining rejection damages, the debtor's survival under the rejected contract and its ability to pay its obligations under the rejected contract are irrelevant.

 6. At the same time, the Court held that by failing to assert the matter in its answer to the claim, the debtor had waived its argument that under 11 U.S.C. § 502(b)(7), employees' claims were limited to one year's compensation. *Cf. In the Matter of Gee and Missler Services, Inc.,* 62 B.R. 841 (Bankr.E.D.Mich.1986).

A. Damages for wage and benefit reductions for hourly employees and over-the-road drivers.

B. Damages for wage and benefit losses incurred by laid off office employees.

C. Damages for lost membership dues for several Teamsters Local Unions.

The Committee contends that in connection with its contract rejection claim, these damages are properly allowed under *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), 11 U.S.C. § 502, and the applicable labor law.

U.S. Truck contends that a new agreement entered into between itself and the Union, implemented on January 11, 1983, bars the claim under theories of contract modification and waiver. It further contends that the claims of laid off employees should be denied because they would have been laid off even absent rejection as a result of proper management decisions, and because the employees did not exhaust the grievance and arbitration procedures of the rejected contract. The debtor further argues that the Committee has shown no damages resulting from the rejection of the agreement. Finally, it disputes several aspects of the Committee's damage calculations.

## II. *Findings of Fact*

1. On June 18, 1982, U.S. Truck filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2. As of the date of the petition, U.S. Truck was a signatory to the March 1, 1982 National Master Freight Agreement with the International Teamsters Union, and the various supplements thereto—the Central States Area Local Cartage Supplemental Agreement (Plaintiff's Exhibit 1), Central States Area Over-the-Road Motor Freight Supplemental Agreement (Plaintiff's Exhibit 2), and Teamsters State of Michigan Office Workers Supplemental Agreement to the National Master Freight Agreement (Plaintiff's Exhibit 3). (All of these agreements are referred to as the rejected agreement). The rejected agreement would have expired by its terms on March 31, 1985.

3. The Teamsters National Freight Industry Negotiating Committee is a committee of local union representatives appointed by the president of the International Teamsters Union to negotiate and execute an industry-wide agreement. The authority of the committee to seek its enforcement is set forth in the constitution of the Teamsters Union and in the rejected agreement.

4. A grievance system was in place under the rejected agreement. U.S. Truck continued the grievance system until approximately April 15, 1983.

5. Shortly after filing its petition but before the agreement was rejected, U.S. Truck inaugurated various measures to reduce expenses, as stated in Findings 6 through 10.

6. The cashier's job was eliminated. This was accomplished by directing the debtor's customers to send payments for freight charges directly to its bank through a lockbox. The purpose for this change was to reduce labor costs and increase interest earnings. Betty Watkins, the cashier whose job was eliminated, was able to use her seniority to obtain a job in the accounts payable department, from which she was later laid off. (*See* Findings 22, 23, and 27, below.)

7. The switchboard operator's job was eliminated by instituting a direct dial system. As a result, Helen Suszek was laid off on July 31, 1982. She did not file a grievance over the layoff. If she had been actively employed by U.S. Truck for the duration of the rejected agreement, her additional wages and benefits would have been $69,536.48. In mitigation of her losses, she received outside earnings and unemployment benefits totalling $47,357.59.

8. Joann Drew was laid off from her secretarial position on August 15, 1982, because her job was consolidated with that of a nonunion confidential secretary. Ms. Drew grieved her layoff and received an award of 2 weeks back pay. If she had remained actively employed by U.S. Truck until December 31, 1984, her additional wages and benefits would have been $67,101.82. In mitigation of these losses, she received outside earnings, the grievance

award, and unemployment benefits totalling $52,726.14. Ms. Drew had no loss for 1985.

9. Hazel Long was laid off on August 27, 1982. She did data processing and miscellaneous office tasks. She had recently used her seniority to bid for a position in the accounts payable department. U.S. Truck gave her some training for that work, but after a time, laid her off as unqualified for the accounts payable position. She was later passed over for recall, when an employee with less seniority was recalled for 3 weeks, and Ms. Long was not. Ms. Long grieved U.S. Truck's failure to follow seniority in the recall and was awarded approximately $999. She did not grieve her layoff. If she had been actively employed by U.S. Truck until her retirement, her additional wages and benefits would have been $26,933.00. In mitigation of her losses, she received unemployment benefits and the grievance award totalling $10,638.00.

10. U.S. Truck rejected the lease of its computer system pursuant to 11 U.S.C. § 365, and subcontracted the work to Computer on Line Data Services (COLDS), a facility operated by the holding company which owns U.S. Truck and other trucking operations. The purpose of this change was to reduce labor and equipment costs. Gloria Gonzalez was laid off from her job as a billing clerk on September 17, 1982, because the billing was transferred to COLDS. She did not grieve her layoff. If she had been actively employed by U.S. Truck through December 31, 1984, her additional wages and benefits would have been $62,517.44. In mitigation of her losses, she received other earnings and unemployment insurance totalling $18,401.05. Ms. Gonzalez failed to timely provide income tax information for 1985, pursuant to the Court's discovery order. (*See* footnote 1, paragraph 4, above.)

11. On July 15, 1982, approximately one month after the bankruptcy filing, the debtor filed a motion to reject the collective bargaining agreement under 11 U.S.C. § 365.

12. On September 9, 1982, (then) Bankruptcy Judge George Woods denied U.S. Truck's motion to reject the collective bargaining agreement, and ordered the parties to negotiate further.

13. The parties did negotiate further, but did not reach an agreement.

14. On December 6, 1982, upon U.S. Truck's motion for reconsideration, the Bankruptcy Court approved the rejection of the collective bargaining agreement. In granting the motion, Judge Woods stated:

> Testimony presented at the September 1 and 9, 1982 hearings established that the debtor is incurring staggering losses; that measures undertaken to reduce expenses have proven insufficient to reverse the loss trend; that the debtor cannot survive given the wage requirements of the collective bargaining contract currently in effect. The Court therefore finds that rejection of the labor contract is absolutely necessary to save the debtor from collapse.

*In re U.S. Truck Company, Inc.*, No. 82–03561–R (Bankr.E.D.Mich. December 6, 1982) (Memorandum Opinion and Order Granting Debtor's Application to Reject Collective Bargaining Agreement at 8.)

15. After the agreement was rejected, U.S. Truck continued paying the wages and benefits required by the rejected agreement until January 11, 1983.

16. On December 8, 1982, U.S. Truck sent a telegram to Jack Yager, an employee of the Central Conference of Teamsters and a member of the Teamster National Freight Industry Negotiating Committee. The telegram set a date for immediate negotiations and indicated that if no agreement were reached within 30 days, U.S. Truck would be required to close down.

17. Representatives of U.S. Truck and the local unions did meet and negotiate. By January 10, 1983, they had drafted a document entitled "Addendum to the National Master Freight Agreement and Over-the-Road Supplement," and two other documents, reducing wages approximately ten percent. Each carried the preamble that it was a "rider" to the particular supplement to the National Master Freight Agreement.

The provisions were phrased as deletions from or amendments to the particular supplement. These documents are referred to as "the new agreement."

18. On January 11, 1983, U.S. Truck's union employees voted to ratify the new agreement. The new agreement was then put before various other Teamsters bodies with varying results. The parties dispute the proper method for achieving official Teamsters approval of the new agreement. U.S. Truck maintains that the new agreement was a valid contract effective January 11, 1983. The Committee maintains that the new agreement never received the necessary approvals and that therefore U.S. Truck implemented the terms of the new agreement on its own.[2]

19. The dispute concerning the effectiveness of the new agreement was one of several issues raised in cross complaints of unfair labor practices that the parties filed with the National Labor Relations Board. However, both complaints were ultimately dismissed without any resolution of the issues. (*See* footnote 3, below.)

20. U.S. Truck implemented the terms of the new agreement on January 11, 1983.

21. During the negotiations for the new agreement, U.S. Truck began to curtail its office operations. On December 10, 1982, the debtor gave the following notice to all union office employees:

On December 20, 1982, the Accounting and Data Processing Departments of U.S. Truck Company, Inc., and Adam's Cartage, Ltd., will be consolidated at the general office of Adam's Cartage, Ltd., 3300 Russell Street, Windsor, Ontario, Canada, N9C 1E6. We believe that through this consolidation more effective and less costly departments will result.

Please report for work at 8:00 a.m. on Monday, December 20, 1982, to Mr. Randy Fields, Corporate Secretary, Adam's Cartage, Ltd., Windsor, Ontario, Canada.

Plaintiff's Exhibit 10. Union officials sought an injunction in the Bankruptcy Court against relocating the office work to Canada. The relocation was delayed, but was ultimately permitted.

22. U.S. Truck transferred the work of its accounting and data processing departments, consolidating them at its nonunion subsidiary, Adams Cartage, in Windsor, Ontario, Canada. Eventually, three new Canadian employees were hired to do the new work.

23. Dorothy Zatkovich was laid off January 10, 1983, because her work was transferred to Adams Cartage. She was a delinquent accounts clerk, involved primarily in collections, and performed miscellaneous office tasks. She did not grieve her layoff. If Ms. Zatkovich had been actively employed by U.S. Truck for the duration of the rejected agreement, her additional wages and benefits would have been $65,772.34. In mitigation of her losses, she received outside earnings and unemployment benefits totalling $17,637.70.

24. Betty Watkins had been the cashier until that job was eliminated some months prior to the January, 1983 layoffs. (*See* Finding 6, above) She moved to accounts payable, from which she was laid off on January 10, 1983, because U.S. Truck transferred this work to Adams Cartage. Ms. Watkins did not grieve her layoff. If she had been actively employed by U.S. Truck until December 31, 1984, her additional wages and benefits would have been $52,582.40. In mitigation of her losses, she received unemployment and Social Security benefits totalling $11,065. Ms. Watkins failed to timely provide income information for 1985, pursuant to the Court's discovery order. (*See* footnote 1, paragraph 4, above.)

25. Computer operators Henry Stys and Joan Baker were laid off on January 10, 1983. The record is not clear whether their jobs were eliminated by the subcontracting to COLDS or the transfer to Adams Cartage. Neither grieved the layoff. If Mr. Stys had been actively employed by U.S. Truck until December 31, 1984, his addi-

---

**2.** For the reasons stated in connection with Conclusions of Law 2–5, it is unnecessary to resolve the dispute as to whether the new agreement was valid; it is referred to as "the new agreement" for convenience only.

tional wages and benefits would have been $56,717.25; he had no loss of income for 1985. In mitigation of his losses, he received outside earnings and unemployment benefits totalling $41,107.38. If Ms. Baker had been actively employed by U.S. Truck for the duration of the rejected agreement, her additional wages and benefits would have been $61,847.82. In mitigation of her losses, she received outside earnings and unemployment benefits totalling $32,324.30.

26. Patricia Mendez was laid off on February 4, 1983 from her job as a tracing clerk when the work was transferred to Adams Cartage. As a union steward, she had super-seniority under the contract. If she had been actively employed by U.S. Truck for the duration of the rejected agreement, except for the six months she was ill, her additional wages and benefits would have been $42,470.40. In mitigation of her losses, she received other income and unemployment benefits totalling $29,861.31.

27. Zatkovich, Watkins, Stys, Baker and Mendez called Customs or Canadian Immigration to inquire how to follow their work to Adams Cartage. They were told they needed certain documents from their employer. Each requested the documents from Joseph Pulis, U.S. Truck's Director of Labor, who refused to provide documents or to cooperate with the employees' efforts to follow their work.

28. The rejected agreement included a clause generally prohibiting the subcontracting of union work:

For the purpose of preserving work and job opportunities for the employees of the signator Employer covered by this Agreement, the signator Employer agrees that no work or services of the kind, nature or type covered by, presently performed, or hereafter assigned to the collective bargaining unit, by the signator Employer, will be subcontracted, transferred, leased, assigned or conveyed in whole or in part by the signator Employer to any other plant, person or non-unit employees, unless otherwise provided in this Agreement. This subcontracting provision is also applicable to the establishment or continuation by the signator Employer of a transportation company or business which engages in the same type of operation covered by this National Master Freight Agreement, which company or business is owned or controlled by the signator Employer. However, the above provision shall not be interpreted so as to expand the provisions of Article 3 (Recognition).

National Master Freight Agreement, Article 32, Section 1, Plaintiff's Exhibit 3 at 66.

29. In its implementation of the new agreement on January 11, 1983, U.S. Truck Company reduced the wages for its hourly employees as follows:

| Classification | Rejected Agreement Pay Rate | New Pay Rate 1/12/83 to 3/31/85 |
|---|---|---|
| Dock | $13.31 | $12.07 |
| Driver | | |
| Detroit, Pontiac, Ypsilanti | 13.41 | 12.07 |
| Upstate | 13.32 | 12.07 |
| Ohio | 13.31 | 12.07 |
| Garage | | |
| Parts Man | 13.26 | |
| Gas/Tire Helper | 13.08 | 11.77 |
| Equipment Checker | 13.28 | |
| Paint/Bump | 13.48 | |
| Mechanics | 13.48 | 12.13 |
| Diesel Mechanics | 13.58 | 12.22 |

| Classification | Rejected Agreement Pay Rate | New Pay Rate 1/12/83 to 3/31/85 |
|---|---|---|
| Office | | |
| Group Class III | $12.49 | $11.38 |
| Group Class IV | 12.64 | 11.38 |
| Group Class V | 12.72 | 11.38 |

30. Under the rejected agreement, specifically the Central States Area Local Cartage Supplemental Agreement, Article 51, and the Teamsters State of Michigan Office Workers' Supplemental Agreement, Article 57, covered employees with at least one year of employment, who worked at least 60% of a given year, received one to five weeks vacation, depending on their years of employment. Vacations were paid at straight time pay for 45 hours per week. No vacation pay was paid for vacations not taken.

31. The new agreement changed the vacation pay to 40 hours per week at straight time pay. In addition, Article 51, Section 1 of the new agreement provided:

For computation for vacation pay, all employees shall have an anniversary date that are presently working of June 19, 1982. Employees must be on the payroll and working 60 percent of the days through January. In the first year of employment, the employees will be allowed to take a vacation and be paid after they have worked 60 percent of that year for the employees presently working upon ratification of this agreement. The rest of the N.M.F.A. shall apply.

Plaintiff's Exhibit 4.

32. Under the rejected agreement, all hourly employees were eligible for five paid sick days per year. Sick leave was paid even if not used.

33. The new agreement eliminated all sick leave.

34. Under the rejected agreement, employees except probationary employees were eligible for ten paid holidays per year if they worked the day before the holiday. Employees required to work on a holiday were paid triple time.

35. The new agreement eliminated three holidays, and imposed the additional requirement that the employee also work the day after a holiday in order to be eligible for the holiday pay.

36. The Court's findings with respect to the damages incurred by the hourly employees caused by the implementation of the new agreement are set forth in table form in Appendix A.

37. The new agreement required over-the-road drivers to acquire truck-tractors which they leased to U.S. Truck.

38. Under the rejected agreement, over-the-road drivers were generally paid mileage rates of 31.75 to 35.515 cents per mile. This rate depended on the type of truck-tractor and cargo. They were also paid an hourly rate of $13.15 to $13.52 per hour for certain delays in pick ups and deliveries and other times when the truck wheels were not turning, depending on type of tractor, cargo and weight. Drivers on "peddle runs" (certain short runs) were paid $13.15 per hour. They were guaranteed eight hours paid at a minimum hourly rate for each day worked.

39. Under the new agreement, compensation was calculated at mileage rates of 60 to 85.5 cents per mile, depending on weight, plus additional flat rates for certain pick ups and deliveries. (On certain short runs, owner-operators were paid an additional 3 cents per mile.) There were no hourly rates or guarantees.

40. The rate of 63 cents per mile is a reliable estimate of the owner-operator's average compensation under the new agreement.

41. Under the rejected contract, drivers who worked 60% of the preceding 12 months were entitled to a paid vacation of 6 to 30 days, depending on their years of employment with U.S. Truck. The vacation

daily pay rate was determined by averaging the employee's daily rate for the previous 12 months. Vacations were paid only if taken, except to some extent for employees eligible for 30 days vacation.

42. Under the new agreement, over-the-road drivers on the payroll from April 1 to April 1 of the next year and who drove 50,000 miles were eligible for vacation pay in 1984 and 1985, under Article 58 of the "Addendum to the National Master Freight Agreement and Over-the-Road Supplement." This article provides in part:

The payment for vacations shall be as follows:

1) One (1) year of employment, $575 in 1984.

Two (2) years of employment, $600 in 1985.

2) Two (2) week vacation for two (2) years shall be $1,150 in 1984 and $1,200 in 1985.

3) Additional qualifications: The employee must accumulate 50,000 paid miles.

Plaintiff's Exhibit 4.

43. The new agreement also eliminated three paid holidays, five days sick leave, and jury pay. Provisions for other paid time, (e.g., layovers, breakdowns), were eliminated. Also, provisions for seniority were eliminated.

44. Shortly after January 11, 1983, officials from U.S. Truck and the union set up a meeting for over-the-road drivers. At the meeting, U.S. Truck officials explained the owner-operator system. Drivers were offered three choices. They could become over-the-road drivers with their own truck-tractors. Or, they could fill one of a limited number of positions as a city driver (a job driving short runs which was considered inferior to over-the-road driving). Or, they could accept an indefinite layoff. Drivers bid on the positions in order of seniority. Union officials handled the bidding.

45. Some drivers who became over-the-road drivers acquired tractors through U.S. Truck. Some of these drivers paid a down payment of one dollar; others who had filed claims for priority administrative expenses in U.S. Truck's bankruptcy case signed over the full amount of their claims as down payment.

46. Over-the-road drivers were offered to purchase a 1976 White tractor previously owned by Central Cartage, a liquidated U.S. Truck subsidiary, for $16,500. Some repair work was done on these tractors, and they were equipped with new tires, new batteries, and a 30 day exchange warranty. Drivers who took this offer financed the purchase on a lease instrument, with GLS Leasco, an affiliated corporation. They paid a down payment as described above, and a security deposit. The lease was without interest.

47. A driver's payments to GLS Leasco on a tractor were deducted directly from gross compensation from U.S. Truck, not to exceed one third.

48. The rejected contract, National Master Freight Agreement Article 53, Section 3, provided:

(a) The Employer shall not require as a condition of continued employment, that an employee purchase truck, tractor and/or tractor and trailer or other vehicular equipment, or that any employees purchase or assume any proprietary interest or other obligation in the business. The requirements of this provision shall be maintained during the renegotiation of this Agreement unless either party has terminated the Agreement in the manner provided.

Plaintiff's Exhibit 2 at 20–21.

49. Under the new agreement, the owner-operators were responsible for maintenance and repairs. They could have work done and parts ordered through U.S. Truck or an independent service. U.S. Truck or an affiliate advanced the money at interest for some in-house and some outside parts and repairs. These were deducted from the owner-operator's compensation after the 1/3 tractor payments.

50. Under the new agreement, owner-operators purchased their own diesel fuel, which U.S. Truck provided at 72 cents per gallon, which was below the retail price. Fuel payments were deducted from compensation after the 1/3 truck payments.

51. Under the new agreement, drivers also paid for storage, license fees and

plates, bobtail insurance (covering the tractor when not in actual service for U.S. Truck), fuel taxes, tolls and ferries. U.S. Truck paid the road or mile tax, Social Security tax, and workers compensation for the period the equipment was in actual service. In some circumstances, U.S. Truck provided cargo insurance, while in others the owner-operator did. In some circumstances U.S. Truck paid fines, while in others the owner-operator did.

52. The rejected agreement provided for dues checkoff which obligated U.S. Truck to deduct monthly union dues from its employees' wages. The relevant provision is Article 3, Section 2 of the National Master Freight Agreement, which reads in part:

> The Employer agrees to deduct from the pay of all employees covered by this Agreement the dues, initiation fees and/or uniform assessments of the Local Union having jurisdiction over such employees and agrees to remit to said Local Union all such deductions prior to the end of the month for which the deduction is made. Where laws require written authorization by the employee, the same is to be furnished in the form required. The Local Union shall certify to the Employer in writing each month a list of its members working for the Employer who have furnished to the Employer the required authorization, together with an itemized statement of dues, initiation fees (full or installment), or uniform assessments owed and to be deducted for such month from the pay of such member, and the Employer shall deduct such amount from the first paycheck following receipt of statement of certification of the member and remit to the Local Union in one lump sum. The Employer shall add to the list submitted by the Local Union the names of all regular new employees hired since the last list was submitted and delete the names of employees who are no longer employed. Check-off shall be on a monthly or quarterly basis at the option of the Union.

Plaintiff's Exhibits 1, 2, 3 at 13.

53. In April of 1983, U.S. Truck stopped deducting union dues, but commenced this again approximately one year later.

54. Between January 1983 and March 1985, the dues which U.S. Truck did not deduct for actively working employees who were members of Local Union 299 totalled $36,998.

55. Between January 1983 and March 1985, the dues which U.S. Truck did not deduct for actively working employees who were members of Local Union 406 totalled $2,650.

56. Between January 1983 and March 1985, the dues which U.S. Truck did not deduct for actively working employees who were member of Local Union 486 totalled $1,205.

57. Between January 1983 and March 1985, the dues which U.S. Truck did not deduct for actively working employees who were members of Local Union 164 totalled $1,809.

58. The debtor's reorganization plan was eventually confirmed. *In the Matter of U.S. Truck Company, Inc.*, 47 B.R. 932 (E.D.Mich.1985), *aff'd sub nom.*, *Teamsters National Freight Industry Negotiating Committee v. U.S. Truck Company, Inc., (In re U.S. Truck Company, Inc.)*, 800 F.2d 581 (6th Cir.1986). This claim comprises Class IX, an impaired class under the plan. Under the terms of the plan, the allowed amount of the claim shall be paid, at the creditor's election, either 70% on the effective date of the plan, or 100% in installments over the 3½ years of the plan. 47 B.R. at 945–46.

### III. *Conclusions of Law*

1. *The Standard for Determining Contract Rejection Damages Is The Standard for Determining Breach of Contract Damages Under 29 U.S.C. § 185.*

■ 11 U.S.C. § 502(g) provides:

A claim arising from the rejection, under section 365 of this title or under a plan under chapter 9, 11, 12, or 13 of this title, of an executory contract or unexpired lease of the debtor that has not been assumed shall be determined, and

shall be allowed under subsection (a), (b), or (c) of this section or disallowed under subsection (d) or (e) of this section, the same as if such claim had arisen before the date of the filing of the petition.

Pursuant to 11 U.S.C. § 365(g), the Committee's claim for contract rejection damages is treated as a pre-petition claim for breach of contract:

(g) Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—

(1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition; ...

See also NLRB v. Bildisco and Bildisco, 465 U.S. 513, 530, 104 S.Ct. 1188, 1198, 79 L.Ed.2d 482 (Rehnquist, J., for the majority), 465 U.S. at 539 n. 8, 104 S.Ct. at 1203 n. 8 (Brennan, J., concurring in part and dissenting in part) (1984); Hall v. Perry, (In re Cochise College Park, Inc.), 703 F.2d 1339, 1352 (9th Cir.1983); Bohack Corporation v. Truck Drivers Local Union No. 807, 431 F.Supp. 646, 656 (E.D.N.Y.1977), aff'd, 567 F.2d 237 (2d Cir.1977), cert. denied, 439 U.S. 825, 99 S.Ct. 95, 58 L.Ed.2d 117 (1978); General Drivers, Warehousemen and Helpers Local 89 v. Midwest Emery Freight System, Inc., 48 B.R. 566, 568 (Bankr.N.D.Ill.1985).

11 U.S.C. § 502(b)(1) provides:

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition,

and shall allow such claim in such amount except to the extent that—

(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured; ...

As noted in In re Continental Airlines Corp., 57 B.R. 845, 849 (Bankr.S.D.Tex. 1985):

The Bankruptcy Court must determine the allowability of claims for both summary judgment and estimation purposes by applying the appropriate substantive law which would be applied in the non-bankruptcy context. See, e.g., Woods-Tucker Leasing Corp. v. Hutcheson-Ingram Development Co., 642 F.2d 744, 748 n. 8 (5th Cir.1981); Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed. 162 (1946).

See also Mazirow v. Grigsby, (In re White Motor Corp.), 44 B.R. 563 (N.D.Ohio 1984). 3 Collier on Bankruptcy ¶ 502.02 at 502–27 to 29 (15th ed. 1987); Bordewieck & Countryman, The Rejection of Collective Bargaining Agreements by Chapter 11 Debtors, 57 Am.Bankr.L.J. 293, 330–31 (1983). Note, The Bankruptcy Law's Effect on Collective Bargaining Agreements, 81 Colum.L.Rev. 391 (1981).

In this case, the Committee's claim for breach of the collective bargaining agreement is determined by reference to the federal common law of labor contracts which has developed under 29 U.S.C. § 185 (Labor Management Relations Act, § 301). Textile Workers v. Lincoln Mills of Alabama, 353 U.S. 448, 455, 77 S.Ct. 912, 917, 1 L.Ed.2d 972 (1957). See Continental, 57 B.R. at 849.[3]

---

3. To remedy a breach of a collective bargaining agreement, a union may sue on the contract in federal district court under 29 U.S.C. § 185.

In some situations, the same circumstances which give rise to a breach of a collective bargaining agreement also give rise to unfair labor practice charges filed with the National Labor Relations Board under 29 U.S.C. § 158 (National Labor Relations Act § 8(a) or (d).) E.g.,

NLRB v. C & C Plywood Corp., 385 U.S. 421, 87 S.Ct. 559, 17 L.Ed.2d 486 (1964). See also C. Morris, The Developing Labor Law, 909–13 (2d ed., 2d printing, 1983). That remedy is a separate proceeding enforcing separate rights under federal law. In the present case, unfair labor practice charges were indeed filed by both the union and the employer, were litigated according to the procedures of the National Labor

### 2. *Whether or Not Valid and Binding, the New Agreement Does Not Bar the Committee's Claim.*

U.S. Truck argues that no contract rejection damages were incurred because the parties entered into and implemented a new collective bargaining agreement on January 11, 1983. In support, U.S. Truck argues several legal theories, including contract modification, express waiver, and implied waiver.

The Committee disputes the validity of the new agreement and contends that the debtor's unilateral changes of January 11, 1983 did cause damages allowable in this claims proceeding.

For the reasons set forth in the discussion under Conclusions of Law 3–5 below, the Court concludes that even if valid, the new agreement does not bar the Committee's damage claims. Accordingly, it is unnecessary to determine whether the new agreement was properly approved by the Union.

### 3. *The New Agreement Did Not Modify the Rejected Agreement.*

█ U.S. Truck argues that a modification or termination of an existing agreement, agreed upon by a union and an employer, precludes a later claim under a modified contract provision. In support, U.S. Truck cites cases involving mid-term modifications of collective bargaining agreements, arguing that such modifications extinguish the employees' rights under the former terms.

It is clear that an employer and a union may voluntarily agree to modify or amend their collective bargaining agreement. *See, e.g., Turner v. Local Union No. 302, International Brotherhood of Teamsters,* 604 F.2d 1219 (9th Cir.1979).

However, that is not what happened here. These parties did not mutually and voluntarily agree to re-open an unsatisfactory portion of their existing agreement, and, with the protections, benefits, and obligations of the agreement intact, mutually agree to changes. In this case, there was no agreement in existence to modify; the rejection of the agreement on December 6, 1982, legally terminated it. Thus, there was no modification of a then existing agreement.

> The debtor in possession cannot ask for partial rejection of a contract, nor can the court require that certain portions of an agreement be retained. After rejection, the union and the employer renegotiate the entire collective bargaining agreement. This creates a risk that provisions that were not financially burdensome will be altered, and that employees may not only receive smaller paychecks, but also may lose accrued seniority credit and vacation time. Bargaining prior to rejection protects employees against the loss of unburdensome benefits since the collective bargaining agreement remains in existence and a debtor in possession asking for financial concessions will be unlikely to request (or receive) other modifications as well.
>
> Note, *The Labor-Bankruptcy Conflict: Rejection of a Debtor's Collective Bargaining Agreement,* 80 Mich.L.Rev. 134, 151–52 (1981).

Relations Act, and were ultimately dismissed by Administrative Law Judge Norman Zankel, applying *NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). *U.S. Truck Company, Inc.,* Case Nos. 7–CA–21936, 7–CA–22018, ALJ Decision (April 2, 1985), (Def. exh. T., items 1, 2, 13).

The unfair labor practice charges are not before this Court. Labor Management Relations Act § 301 does not authorize suit in the federal courts for interference with rights guaranteed by National Labor Relations Act § 8. *E.g., Schatte v. International Alliance of Theatrical Stage Employees,* 182 F.2d 158 (9th Cir.1950), *cert. denied,* 340 U.S. 827, 71 S.Ct. 64, 95 L.Ed. 608 (1950).

The present proceeding concerns only the rights and remedies attending a breach of contract under 29 U.S.C. § 185, as applied through the bankruptcy claims procedure of 11 U.S.C. § 502.

U.S. Truck argues that after a collective bargaining agreement expires and the parties bargain to impasse, the employer may unilaterally implement certain proposals without committing an unfair labor practice. This argument is relevant only to unfair labor practice claims under 29 U.S.C. § 158, not to contract claims under 29 U.S.C. § 185 and 11 U.S.C. § 502.

**4. *The New Agreement Did Not Waive the Committee's Contract Rejection Claim.***

No doubt the parties could have executed a new agreement that waived the Committee's contract rejection claim. The question is whether the new agreement, assuming it was effective, did waive this claim for damages.

In support of its position that the new agreement did waive the Committee's claim, U.S. Truck cites *Turner v. Local Union No. 302, International Brotherhood of Teamsters*, 604 F.2d 1219 (9th Cir. 1979); *Fraser v. Magic Chef-Food Giant Markets, Inc.*, 324 F.2d 853, 857 (6th Cir. 1963); *Veale v. Eltra Corporation*, 112 L.R.R.M. 2347 (BNA) (M.D.Pa.1982), *Hayden v. RCA Global Communications, Inc.*, 443 F.Supp. 396 (N.D.Ca.1978); and *United Steelworkers Local 1617 v. G.F. Business Equipment, Inc.*, 105 L.R.R.M. 2762 (BNA) (N.D.Ohio 1978), *aff'd*, 620 F.2d 303 (6th Cir.1980).

The Court concludes that these cases are inapposite because they concern claims for breach of expressly modified provisions arising from the employer's post-modification conduct. Most of these cases decide whether the modification itself was a breach of the duty of fair representation, or an unfair labor practice, or a breach of contract. They do not apply to a claim for contract breach which accrued before a modification or a new agreement.

More applicable are the cases which apply the common law doctrine of accord and satisfaction in the labor setting. *See, e.g., Keppard v. International Harvester Co.*, 581 F.2d 764 (9th Cir.1978); *Communication Equipment Workers, Inc. v. Western Electric Company, Inc.*, 328 F.Supp. 240 (D.Md.1971).

Under these circumstances, it is clear that it is federal substantive law which controls resolution of the contractual dispute. [*Textile Workers Union of America v.*] *Lincoln Mills*, 353 U.S. [448] at 456–57, 77 S.Ct. [912] at 917–18 [1 L.Ed.2d 972 (1957)]. In the absence of controlling federal law principles, however, we may look for guidance to general common law principles, including the substantive law of the state in which the contract arose. These borrowed principles in this context, of course, are "absorbed as federal law" and become the federal common law of labor disputes. See *id.* at 457, 77 S.Ct. at 918. The principles of accord and satisfaction are well established in both the general common law and the law of Michigan where the present contract originates.

*International Union, UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1487 (6th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984).

■ The basic elements of an accord and satisfaction or discharge by substituted performance are: a disputed claim; a substituted performance agreed upon and accomplished; and valuable consideration. *Yard-Man*, 716 F.2d at 1487–88. *See also* 6 *Corbin on Contracts* §§ 1276–1292 (1962 ed.).

There can be "no accord and satisfaction without expression of assent." 6 *Corbin* § 1277. *See Bennett v. Machined Metals Co., Inc.*, 591 F.Supp. 600, 607–08 (E.D.Pa. 1984); *International Longshoremen's and Warehousemen's Union, Local 34 v. Cargill, Inc.*, 372 F.Supp. 807 (N.D.Cal.1974); *United Garment Manufacturing Co. v. Minnesota Joint Board, Amalgamated Clothing Workers of America*, 211 F.Supp. 414, 418 (D.Minn.1962).

In order that a performance rendered by an obligor shall operate as a satisfaction of the claim against him, it must be offered as such to the creditor. There must be accompanying expressions sufficient to make the creditor understand, or to make it unreasonable for him not to understand, that the performance is offered to him as full satisfaction of his claim and not otherwise. If it is not so rendered, there is no accord, either executory or executed, for the reason that there are no operative expressions of agreement—no sufficient offer and acceptance. [Footnotes omitted.]

*Corbin* § 1277 at 117–121.

■ Assent is essential to effect a rescission and substituted contract. *See Ra-*

*bouin v. National Labor Relations Board,* 195 F.2d 906, 911 (2d Cir.1952), citing 6 *Corbin on Contracts* 147 (1951 ed.), (§ 1293 at n. 4, 1962 ed.).

■ Accordingly, the Court must review the new agreement for the requisite expressions of agreement. Such a review must recognize that as a result of the rejection of the collective bargaining agreement, the new agreement was negotiated from "ground zero" after many years of bargaining history between the parties. The effect of such an agreement may be difficult to determine under the federal common law of labor contracts, because most labor contract precedent does not address such agreements, created under the unusual conditions imposed by operation of the bankruptcy laws. Typical collective bargaining agreements contain automatic renewal clauses. *See* 1 C. Morris, *The Developing Labor Law,* 663 (2d ed. 2d printing 1983); Merrick, *The Bankruptcy Dynamics of Collective Bargaining Agreements,* 91 Com.L.J. 169, 193 (1986).

Nothing suggests that the mere existence of such a new agreement, by itself, operates as a waiver of the Committee's contract rejection claim. Moreover, the Court concludes that nothing in the new agreement manifests any intent to waive the Committee's claims.[4] Certainly there is no such express language; nor is it anywhere implicit.

Therefore, the Court concludes that the new agreement did not operate as an accord and satisfaction or a contractual waiver of the Committee's claim.

5. *The Union Did Not Impliedly Waive Its Claim By Its Acceptance of Benefits Under the New Agreement.*

■ Finally, U.S. Truck argues that regardless of the validity of the new agreement, in accepting benefits under the new agreement, the union impliedly waived the employer's obligation under the rejected agreement. The Court cannot agree.

U.S. Truck cites *United Steelworkers Local 1617 v. G.F. Business Equipment, Inc.,* 105 L.R.R.M. 2762, 2764 (BNA) (N.D. Ohio 1978), *aff'd,* 620 F.2d 303 (6th Cir. 1980). That case is distinguishable because there the court found that the union's express agreement to a mid-term modification meant that there was no breach of contract. The court cited the parties' subsequent acceptance of benefits as additional evidence of the earlier rescission and discharge.

U.S. Truck also cites *Keppard v. International Harvester Co.,* 581 F.2d 764 (9th Cir.1978), which was cited with approval in *International Union, UAW v. Yard-Man, Inc.,* 716 F.2d 1476, 1485 n. 12, 1492 n. 4, Holschuh, J., concurring in part, dissenting in part (6th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). That case is likewise distinguishable; there the Court found an accord and satisfaction in the acceptance of a settlement check. The union expressly agreed to the settlement of the grievance, and so advised the employee who accepted the check.

In this argument, U.S. Truck impermissibly attempts to establish an accord and satisfaction without the necessary expression of assent.

U.S. Truck further argues that because the employees continued to work and continued to accept their paychecks under the terms of the new agreement, they and their union necessarily agreed to waive the contract rejection claim. The Court cannot agree. To require the employees to strike or to refuse their wages and benefits under the new agreement as a condition of maintaining their rejection damage claims would promote labor discord for debtors in reorganization,[5] thereby obstructing both the bankruptcy policy of affording debtors breathing space and flexibility to reorga-

---

4. Apparently, a subsequent agreement to waive the claim was disapproved by the union, *see Matter of U.S. Truck Co., Inc.,* 47 B.R. 932, 934–35 (E.D.Mich.1985). However neither party offered any evidence of this or argued that any inferences should be drawn from these cir-cumstances. Accordingly, the Court has not considered it.

5. *But see In re Continental Airlines Corp.,* 57 B.R. 845, 847 (Bankr.S.D.Tex.1985).

nize[6] and the national labor policy of encouraging collective bargaining in the interest of industrial peace.[7] The Court will not impose such a heavy burden on the post-rejection labor negotiating process.

Accordingly, the Court rejects U.S. Truck's position that by accepting benefits under the new agreement, the union and the employees impliedly waived their claims for contract rejection damages.

### 6. Employees Laid Off in Violation of the Rejected Agreement Are Entitled to Contract Rejection Damages.

U.S. Truck argues that employees, laid off either before or after the rejection of the contract, incurred no damages as a result of the rejection. It argues that such employees would have been laid off even absent rejection as a result of proper management decisions, and that in any event the employees' claims are barred by their failure to pursue the grievance mechanisms of the rejected contract.

In the discussions in connection with Conclusions of Law 7, 8, 9, 11 and 12 the Court rejects these arguments. In Conclusion of Law 10, the Court agrees with U.S. Truck that one employee who grieved her layoff and received an award is barred from further recovery.

### 7. That an Employee Would Have Been Laid Off Even Absent Rejection Is Irrelevant If the Layoff Violated the Rejected Agreement.

Generally, a collective bargaining agreement only prescribes the wages and conditions applicable to employment, and does not guarantee future employment. *See, e.g., J.I. Case Co. v. NLRB,* 321 U.S. 332, 80 S.Ct. 419, 4 L.Ed.2d 454 (1944);

*Fraser v. Magic Chef—Food Giant Markets, Inc.,* 324 F.2d 853, 856 (6th Cir.1963); *In re Continental Airlines Corporation,* 64 B.R. 865, 872 (Bankr.S.D.Tex.1986). However, the conditions applicable to employment may include contractual limitations on the circumstances in which employment may be terminated. To the extent that these job security provisions are enforceable under 29 U.S.C. § 185, they form the basis of an allowable damage claim.

The Court recognizes that certain language of *In re Continental Airlines,* 64 B.R. 865 (Bankr.S.D.Tex.1986), supports U.S. Truck's argument:

Federal labor law does not require an award of damages for time periods during which no work would have been available in any event, even where an employee was discharged in violation of the NLRA. *See NLRB v. Biscayne Television Corp.,* 337 F.2d 267, 268 (5th Cir. 1964); *Nabors v. NLRB,* 323 F.2d 686, 690 (5th Cir.1963); *Midland Ross, Inc.,* 239 N.L.R.B. 1205 (1979), *order enf'd,* 653 F.2d 239 (6th Cir.1981); *NLRB v. United Contractors, Inc.,* 614 F.2d 134, 138 (7th Cir.1980); *NLRB v. Columbia Tribune Publishing Co.,* 495 F.2d 1384, 1393 (8th Cir.1974); *NLRB v. American Creosoting Co.,* 139 F.2d 193 (6th Cir. 1943); *Brown & Root, Inc.,* 112 N.L.R.B. 295 (1955); *Lauren Burt, Inc. of Colorado,* 114 N.L.R.B. 295 (1955); *Hill Transportation Co.,* 102 N.L.R.B. 1015 (1953). But for the Court's rejection of the collective bargaining agreement at issue here, Continental would have gone out of business and pilots represented by ALPA

---

6. *See* H.Rep. No. 595, 95th Cong., 1st Sess. 220–21 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6179–80. *See also* Miller, *Chapter 11 of the Bankruptcy Act and Collective Bargaining Agreements,* 52 Fordham L.Rev. 1120, 1121–22 (1984).

7. *See, e.g., NLRB v. Insurance Agents' Intern. Union,* 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454 (1960), wherein the court described the National Labor Relations Act:

It is apparent from the legislative history of the whole Act that the policy of Congress is to impose a mutual duty upon the parties to confer in good faith with a desire to reach

agreement, in the belief that such an approach from both sides of the table promotes the overall design of reaching industrial peace.... But apart from this essential standard of conduct, Congress intended that the parties should have wide latitude in their negotiations, unrestricted by any governmental power to regulate the substantive solution of their differences.

361 U.S. at 488, 80 S.Ct. at 426. *See also* Bordewieck & Countryman, *The Rejection of Collective Bargaining Agreements by Chapter 11 Debtors,* 37 Am.Bankr.L.J. 293, 297–299 (1983).

could not have claimed lost future wages as damages, because the agreements did not guarantee future employment.

64 B.R. at 872.

The holding in *Continental* appears to follow the court's determination that because the agreement was not violated, the employees had no claim under the collective bargaining agreement. *See also In re Continental Airlines,* 64 B.R. 882, 890 (Bankr.S.D.Tex.1986). To the extent that *Continental* merely holds that a viable claim in bankruptcy depends upon a viable contract claim under 29 U.S.C. § 185, this Court agrees; this is a summary of familiar principles under 11 U.S.C. §§ 365 and 502, which will be applied in this case.

 However, this Court cannot agree that in order to prove a laid off employee's damages, the continuation of the employment absent rejection must be proven. As noted, the issue is the extent of an employee's damages under 29 U.S.C. § 185, not the extent of the employment absent rejection.

Moreover, the cases cited in *Continental* do not support the conclusion that under 29 U.S.C. § 185 the employee is required to prove that absent the breach, his employment would have continued; there are two distinctions.

First, the cases cited in *Continental* concern remedies ordered by the National Labor Relations Board for unfair labor practices, not remedies ordered by the courts for violations of collective bargaining agreements. *See* footnote 3, above.

Second, although cases such as *NLRB v. Biscayne Television Corp.,* 339 F.2d 267 (5th Cir.1964) articulate a limitation on damages for unfair labor practices, the facts necessary to establish the limitation are speculative in the bankruptcy context.

In these cases, the NLRB found that the employees (discriminatees) were illegally discharged for union activity (not in violation of the contract), and the NLRB awarded reinstatement with back pay. The employers were given an opportunity to prove that, due to the seasonal nature of the work, or due to layoffs which affected employees situated similarly to the discriminatee, (e.g. similar job classification and seniority), the discriminatee would not have been actively employed for the entire period of the back pay award, even absent the unlawful discharge. If the employer succeeded in its burden to prove this limitation, the back pay award was tolled for the relevant period. *See also* the NLRB's *Woolworth* formula, described in 48A Am. Jur.2d, *Labor and Labor Relations* § 1593 (2d ed. 1979); *F.W. Woolworth Co. and Retail Clerks International Assoc.,* 90 N.L.R.B. 280 (1050), 26 L.R.R.M. 1185 (BNA); *NLRB v. Seven-Up Bottling Co.,* 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953). Similarly, where an employer in an unfair labor practice action succeeds on its burden to prove that the discriminatee's job has been properly eliminated, absent an applicable job security right such as bumping or transfer, the employer is not required to reinstate the discriminatee.

These determinations are made *ex ante,* using the employer's actual conduct of labor relations in the interim as a factual record. Here, U.S. Truck invites the Court to construct a speculative scenario of what would have happened to the laid off employees' jobs, assuming it had been required to continue complying with the rejected agreement, given its financial condition. Such an inquiry would be fundamentally different from the inquiry undertaken in the cases cited in *Continental,* 64 B.R. at 872.

More on point is *Local 461, International Union of Electrical Workers v. The Singer Company,* 540 F.Supp. 442 (D.N.J. 1982). There, the union had agreed to contract concessions, and the employer agreed to spend two million dollars restructuring the plant and to use its best efforts to secure defense contract work and otherwise maintain the facility as a viable economic entity. In the subsequent contract enforcement suit, the court stated:

Despite its admission that it stands in breach, Singer takes the position that it owes plaintiffs nothing in damages. Defendant argues that plaintiffs are only entitled to the benefit they would have

received had the $2 million been spent and best efforts employed. Singer contends that had it complied with the contract the plant would still have been forced to close in any event due to decreased market demand and that plaintiffs would have been no better off than they are now. The Court finds Singer's position to be untenable.

. . . .

Second, it is clear that the theory upon which defendant bases its claim that damages should be totally denied is fatally flawed. Defendant would have this Court project what *might* have happened had Singer expended the $2 million and conclude that the plant would have closed in any event by the end of 1982. Singer contends that its efforts would have been in vain, but plaintiffs argue that had the money been spent and had defense work been secured the plant would have undergone a resurgence. It is plain that this Court cannot now divine through some occult device what might have been had Singer fulfilled its obligations. This Court cannot measure damages in such a speculative manner.

540 F.Supp. at 449–50.

The court determined that the measure of damages was the greater of the two million dollars or the value of the union's concessions.

Finally, the Court notes that there is a principled basis for the distinction. First, an NLRB award is for vindication of a public right, *e.g.*, *NLRB v. Baldwin Locomotive Works*, 128 F.2d 39, 44 (3d Cir. 1942); *NLRB v. Killoren*, 122 F.2d 609, 612 (8th Cir.1941), *cert. denied*, 314 U.S. 696, 62 S.Ct. 412, 86 L.Ed. 556 (1941), while contractual damages compensate the injured party for the value of what was promised less the value of what was actually received. Second, as suggested in *Singer*, 540 F.Supp. at 449–50, contractual promises are usually unconditional. While the employer has no obligation to provide continued employment *per se*, the agreed upon *terms* of employment are not usually made contingent upon the stability of a particular level of market demand, or other financial exigencies.

Accordingly, the Court concludes that it is irrelevant whether an employee's employment would have continued if the contract had not been rejected.

8. *That Certain Damages Resulted from Management Decisions is Irrelevant if the Damages Resulted From a Violation of the Rejected Agreement.*

■ U.S. Truck has also argued that certain damages sustained by employees are not contract rejection damages because these damages resulted from proper management decisions or reductions in operations.

This argument must be rejected, however, because to the extent that the collective bargaining agreement included protections against these types of damages, the employees clearly lost the value of such protections as a result of rejection of the collective bargaining agreement. To the extent that rejection of the collective bargaining agreement freed U.S. Truck to implement its management decisions and reductions in operations, it must be held that the damages did result from the rejection of the collective bargaining agreement.

9. *Laid Off Employees' Rejection Damage Claims Are Not Barred by Their Failure to Exhaust the Grievance and Arbitration Procedures of the Rejected Contract.*

U.S. Truck contends that laid off employees were required to exhaust their remedies under the grievance and arbitration procedures of the rejected contract, which it voluntarily continued until approximately April 15, 1983. Only one employee, Joann Drew, grieved her layoff and received a grievance award.

■ The federal common law of labor contracts favors contractual grievance procedures and arbitration as the means to resolve contractual labor disputes. *Republic Steel Corporation v. Maddox*, 379 U.S. 650, 653, 85 S.Ct. 614, 616, 13 L.Ed.2d 580 (1965). Thus, failure to exhaust contractual grievance remedies generally bars an employee's suit under 29 U.S.C. § 185. *Id.;*

*Vaca v. Sipes,* 386 U.S. 171, 184, 87 S.Ct. 903, 913, 17 L.Ed.2d 842 (1967).

An important exception to this rule, however, applies here.

An obvious situation in which the employee should not be limited to the exclusive remedial procedures established by the contract occurs when the conduct of the employer amounts to a repudiation of those contractual procedures. *Cf. Drake Bakeries v. Bakery Workers,* 370 U.S. 254, 260–263 [82 S.Ct. 1346, 1350–1352, 8 L.Ed.2d 474 (1962) ]. See generally 6A Corbin, Contracts § 1443 (1962). In such a situation (and there may of course be others), the employer is estopped by his own conduct to rely on the unexhausted grievance and arbitration procedures as a defense to the employee's cause of action.

*Id.* at 185, 87 S.Ct. at 914. *See also Schum v. South Buffalo Ry. Co.,* 496 F.2d 328, 330 (2d Cir.1974).

■ The Court concludes that rejection of a collective bargaining agreement in bankruptcy is just such a situation amounting to an employer's repudiation of contractual grievance procedures. Therefore, the Court holds that an employee's failure to pursue the dispute resolution procedures of the rejected contract does not bar the claim.[8]

In *Bildisco,* the Supreme Court reasoned that because the rejection of a contract relates back to the day before the bankruptcy petition, "the filing of the petition in bankruptcy means that the collective-bargaining agreement is no longer immediately enforceable, and may never be enforceable again." *NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 532, 104 S.Ct. 1188, 1199, 79 L.Ed.2d 482 (1984). Thus, U.S. Truck is in the anomolous position of having terminated its contractual obligations under the rejected agreement, while insisting on its employees' contractual duty to grieve their claims. The Court will not accept this position to bar the claim.

■ The Court concludes that the normal bankruptcy procedure for allowing claims is a proper procedure for resolving this dispute. *See Bildisco,* 465 U.S. at 530, 531, 104 S.Ct. at 1198, 1199; *International Union, UAW v. Davis, (In re Muskegon Motor Specialties Company* ), 313 F.2d 841, 842 (6th Cir.1963), *cert. denied,* 375 U.S. 832, 84 S.Ct. 51, 11 L.Ed.2d 63 (1963); *In re Continental Airlines Corporation,* 64 B.R. 865, 868–71 (Bankr.S.D.Tex.1986); *United Food and Commercial Workers Local 626 v. Flechtner Packing Company,* 63 B.R. 585, 588 (Bankr.N.D.Ohio 1986); *General Drivers, Warehousemen and Helpers Local 89 v. Midwest Emery*

---

8. Neither party here requested an order to arbitrate. Thus, the cases deciding whether to order post-rejection arbitration are inapplicable. *See Nolde Brothers, Inc. v. Local No. 358, Bakery & Confectionery Workers Union,* 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977), (a non-bankruptcy case, holding the duty to arbitrate may survive contract termination when the dispute is over a contractual obligation); *International Union, UAW v. Davis, (In re Muskegon Motor Specialties Company),* 313 F.2d 841 (6th Cir. 1963), *cert. denied,* 375 U.S. 832, 84 S.Ct. 51, 11 L.Ed.2d 63 (1963), (where the employer was out of business, without a plant or employees, and rights of the employees had become fixed, the Bankruptcy Court would not surrender its jurisdiction to fix claims); *Bohack Corporation v. Truck Drivers Local Union No. 807,* 431 F.Supp. 646 (E.D.N.Y.1977), *aff'd,* 567 F.2d 237 (2d Cir. 1977), *cert. denied,* 439 U.S. 825, 99 S.Ct. 95, 58 L.Ed.2d 117 (1978), (weighing the policies for adjudication in the two forums, and which issues are appropriate for each; the union did not

waive its right to grievance arbitration by filing its claim in bankruptcy); *In re Continental Airlines Corporation,* 64 B.R. 865, 868–71 (Bankr.S. D.Tex.1986); *In re Continental Airlines Corporation,* 64 B.R. 882, 886–87 (Bankr.S.D.Tex.1986), (refusing to order arbitration and asserting bankruptcy court jurisdiction over claims involving the Railway Labor Act); *United Food and Commercial Workers Local 626 v. Flechtner Packing Company,* 63 B.R. 585 (Bankr.N.D.Ohio 1986) (refusing arbitration of pre-petition grievances as burdensome; finding that rejection nullified post-petition grievances); *Ohio Valley Carpenters District Council, Local No. 415 v. Valley Kitchens, Inc.,* 58 B.R. 6 (Bankr.S.D.Ohio 1985), (refusing arbitration as burdensome); *General Drivers, Warehousemen and Helpers Local 89 v. Midwest Emery Freight System, Inc.,* 48 B.R. 566 (Bankr.N.D.Ill.1985), (applying *Bildisco* to find arbitration clause unenforceable for post-petition grievances; applying *Nolde* to order arbitration of pre-petition grievances.)

*Freight System, Inc.*, 48 B.R. 566, 568 (Bankr.N.D.Ill.1985).[9]

10. *One Laid Off Employee Who Received a Grievance Award is Barred from Further Contract Rejection Damages.*

■ The Court agrees with U.S. Truck that Joann Drew, who received a monetary award for her layoff but not reinstatement, has no future expectation interest under the contract. In this case the employee has already settled her claim, reaching an accord and satisfaction, as discussed above in connection with Conclusion of Law 4. *See Keppard v. International Harvester Co.*, 581 F.2d 764 (9th Cir.1978). Accordingly, this claim cannot be relitigated in the bankruptcy claims procedure. Thus, the Court must disallow the Committee's claim asserted on behalf of Joann Drew.

11. *Six Office Employees Laid Off in Violation of the Anti-Subcontracting Clause of the Rejected Agreement Are Entitled to Damages.*

The Court has found that the layoffs of Gloria Gonzalez, Dorothy Zatkovich, Betty Watkins, Henry Stys, Joan Baker and Patricia Mendez occurred because U.S. Truck transferred the work that they had performed to COLDS or to its subsidiary, Adams Cartage.

■ The rejected agreement contained an anti-subcontracting clause. *See* Finding of Fact 28, above. The Court concludes that this clause would preclude U.S. Truck from eliminating jobs either by subcontracting the billing work to COLDS, or by consolidating its office operation with Adams Cartage.

■ Anti-subcontracting clauses are enforceable in grievance procedures and in suits under 29 U.S.C. § 185. The employer's financial crisis is not a defense to breach of an anti-subcontracting clause. *See, e.g., Big Bear Mining Company v. District 17, United Mine Workers of America*, 579 F.Supp. 1072 (S.D.W.Va. 1983); *Norton and Son of California, Inc. and Brotherhood of Painters, Decorators and Paperhangers of America, Local 1232*, 67–1 Lab.Arb.Awards ¶ 8340 (1967) (CCH) (neither operational convenience nor outright financial anguish excuse an improper layoff, concerning layoffs out of seniority order).

The question is what damages the employees incurred in losing the protection of this clause.

■ Generally, employees laid off in violation of an anti-subcontracting clause are awarded reinstatement and back pay, less mitigation. Back pay can substitute for reinstatement, the back pay obligation continuing as long as the right to reinstatement. 48A. Am.Jur.2d, *Labor and Labor Relations* § 1590 at 103 (2d ed. 1979). The cutoff date for determining damages is the expiration date of the contract, *International Brotherhood of Electrical Workers v. A–1 Electric Service, Inc.*, 535 F.2d 1 (10th Cir.1976), *cert. denied*, 429 U.S. 832, 97 S.Ct. 94, 50 L.Ed.2d 96 (1976), or the duration of the layoff,[10] *Jones Dairy Farm and United Food and Commercial Workers, International Union, Local P–1236*, 83–2 Lab. Arb. Awards ¶ 8389 (1983) (CCH); *American Standard Inc. and International Association of Machinists and Aerospace Workers, Lodge 681*, 82–1 Lab. Arb. Awards ¶ 8125 (1982) (CCH). *See also Big Bear Mining Company v. District 17, United Mine Workers of America*, above. Fringe benefits should be included in the back pay award, including vacations, to the extent actual economic loss was suffered by the employee. *Pitts v. Frito-Lay, Inc.*, 523 F.Supp. 7 (E.D.Mich.

---

**9.** U.S. Truck's volunteerism in retaining grievance procedures and other contract terms does not alter the status of the rejected agreement. U.S. Truck petitioned for contract rejection and was granted it, thus rendering the contract unenforceable except through the bankruptcy claims procedure. It could not revive the legal effect of the grievance procedure. "The debtor in possession cannot ask for partial rejection of a contract,...." Note, *The Labor-Bankruptcy Conflict: Rejection of a Debtor's Collective Bargaining Agreement*, Mich.L.Rev. 134, 151 (1981).

**10.** The Committee does not claim damages beyond the term of the rejected agreement. Thus, the Court need not decide whether any particular contract rights extend beyond that date.

1980), *aff'd in relevant part, rev'd in part on other grounds*, 700 F.2d 330 (6th Cir. 1983); *International Paper Company, Pine Bluff Mill and United Paperworkers International Union, Local No. 735*, 81–2 Lab. Arb. Awards ¶ 8368 (1981) (CCH).

■ Accordingly, the portions of the Committee's claim on behalf of the following employees will be allowed in the following amounts:

| Employee | Allowed Amount of Claim | Finding |
|---|---|---|
| Gloria Gonzalez | $ 44,116.39 | 10 |
| Dorothy Zatkovich | 48,134.64 | 23 |
| Betty Watkins | 41,517.40 | 24 |
| Henry Stys | 15,609.87 | 25 |
| Joan Baker | 29,523.52 | 25 |
| Patricia Mendez | 12,609.09 | 26 |
| Total | $191,510.91 | |

12. *Two Office Employees Whose Layoffs Did Not Violate the Rejected Agreement Are Not Entitled to Damages.*

The converse of Conclusion of Law 6, above, is that employees whose layoffs did not violate the rejected agreement, and who are therefore not entitled to damages under 29 U.S.C. § 185, are not entitled to contract rejection damages in bankruptcy. There are two such employees, Hazel Long and Helen Suszek.

a. *Hazel Long*

■ Hazel Long was laid off as unqualified for an office job which she had used her seniority to obtain. *See* Finding of Fact 9. The Committee has not argued and the Court has not found that her layoff was improper under the rejected agreement. The Court notes that senior employees had certain "bumping" rights under the collective bargaining agreement. Under Article 43, Section 8 of the Teamsters State of Michigan Office Workers Supplement Agreement to the National Master Freight Agreement (Plaintiff's Exhibit 3, p. 94), an employee could use her seniority to bid on a job opening within the bargaining unit, and if, after a 30 day period of training in the new job, the employee was found unqualified to do the work, she would be returned to her former position and rate of pay. Under Article 43, Sections 3 and 4 (Plaintiff's Exhibit 3, pp. 91–92), however, if an employee's former job was eliminated, and she used her seniority to "bump" up to a higher position, but was unable to do the work, she could properly be laid off. Because there was no factual testimony or legal argument at trial about the application of these contractual provisions to Hazel Long's circumstances, the Court must conclude that she did not sustain any contract rejection damages.

b. *Helen Suszek*

■ Helen Suszek was laid off when the switchboard job was eliminated. There was no provision in the rejected agreement which would offer her protection from this layoff. Accordingly, the Court finds that she did not sustain damages from rejection of the collective bargaining agreement, and disallows the portion of the Committee's claim on behalf of Helen Suszek.

13. *The Debtor's Hourly Employees Are Entitled to Damages; Whether an Employee Was on Active Status on December 6, 1982 is Irrelevant.*

■ On January 11, 1983, the hourly wages were reduced by approximately ten percent. (*See* Finding of Fact 29.) The Court finds that employees who worked between then and March 31, 1985 (the rejected agreement's expiration date), in job classifications covered by the rejected agreement, were damaged by rejection of the contract.

■ The rejected agreement covered all employees who were employed during the

contract term, including employees hired or recalled from layoff after its execution. Therefore, it does not matter whether an employee was on active status on December 6, 1982, when the collective bargaining agreement was rejected.

■ Rejection of the collective bargaining agreement in bankruptcy does not freeze the pool of beneficiaries under the contract. Rather, rejection operates to convert the contract claim from one enforceable in federal district court under 29 U.S.C. § 185 to one allowable in the bankruptcy case under 11 U.S.C. § 502(b).

■ The claim on behalf of the employees is simply a claim for the wages promised for the hours actually worked. An award of lost wages is the proper remedy for a reduction in wages in violation of the contract. *See, e.g., Oscar Mayer Foods Corporation v. Beef Boners and Sausage Makers Union Local 100,* unpublished opin., No. 84 C 8460, (N.D.Ill. November 2, 1984), 118 L.R.R.M. 2561 (BNA) [Available on WESTLAW, DCT database], *aff'd,* 757 F.2d 1291 (7th Cir.1985); *One-Hour Martinizing Cleaners and Laundry and Dry-Cleaning International Union, Local 3009,* 68–1 Lab. Arb. Awards ¶ 8310 (1968) (CCH); *Southeastern Propane Gas Company and International Brotherhood of Teamsters, Local 290,* 66–1 Lab. Arb. Awards ¶ 8024 (1965) (CCH). A back pay award should include overtime. 48A Am. Jur.2d, *Labor and Labor Relations* § 1593 at 106 (2d ed. 1979). *See also One-Hour Martinizing Cleaners,* 68–1 Lab. Arb. Awards.

14. *The Committee's Evidence of the Hourly Employees' Lost Wages and Benefits, As Corrected Due to the Debtor's False Interrogatory Answers, is Reasonably Accurate.*

At trial, the Committee gave testimony from a certified public accountant, Victor Wrotslavsky, who developed Exhibit 28. This exhibit consisted of a listing of 115 hourly employees with their years of hire, the number of regular hours worked, the number of overtime hours worked, the job classifications, the contractual wage rates, the actual wage rates, the regular pay differentials, the overtime pay differentials and the calculated wage losses. The exhibit also included information and calculations pertaining to lost vacation, sick, and holiday pay for each employee. It contains simple mathematical calculations based on information provided by U.S. Truck in its answers to interrogatories (Plaintiff's Exhibits 11 and 12). These answers had provided two numbers for each employee for each year, labelled respectively "regular hours worked" and "overtime hours worked".

On cross examination, U.S. Truck's attorney sought Wrotslavsky's opinion as to the accuracy of his calculations if the figures for regular hours worked and overtime hours worked were incorrect. Wrotslavsky agreed that if the information in U.S. Truck's answers to interrogatories was incorrect, his calculations in Plaintiff's Exhibit 28 would likewise be incorrect.

Later in the hearing, it developed that U.S. Truck's answers to interrogatories were in fact false. They were prepared from a computer printout, which placed the *sum* of an employee's regular hours worked and overtime hours worked in one column ("Column A"), and then restated the overtime hours in a second column ("Overtime Column"). The debtor's payroll computer program calculated the employee's pay by multiplying "Column A" by the employee's regular wage, then multiplying the "Overtime Column" by half the employee's regular wage, and then adding the two products together.

In the answers to interrogatories, the numbers on the computer printout in "Column A" were stated to be the employees' "regular hours worked," although they were actually the sum of the employees' regular *and* overtime hours. (The numbers from the computer printout in the "Overtime Column" were correctly stated.)

The answers to interrogatories were filed six weeks before trial; supplemental answers, correcting yet another deficiency, were filed one week later. U.S. Truck realized that the answers were incorrect some

time after they had been provided, but took no steps to rectify this matter before Wrotslavsky testified at the hearing.

The Court finds that U.S. Truck's answers to these interrogatories were more than misleading; they were unequivocally and unambiguously false.

■ When a party has made an incorrect response in its answers to interrogatories, and has failed to supplement its response, the trial court has an inherent power to impose sanctions in order to protect the integrity of its processes. *See* 8 C. Wright & A. Miller, *Federal Practice & Procedure: Civil* § 2050 at 325–26 (1970). *Cf. Evanson v. Union Oil Company of California*, 619 F.2d .72 (Temp.Emer.Ct. App.1980), *cert. denied sub nom., Union Oil Co. of Cal. v. Evanson*, 449 U.S. 832, 101 S.Ct. 102, 66 L.Ed.2d 38 (1980).

■ This case is distinguishable from one in which a party is embarrassed by its answer to an interrogatory, but then at trial is not precluded from taking a different position or from explaining the discrepancy. *See* C. Wright & A. Miller, § 2181 at 579. *Cf. Freed v. Erie Lackawanna Railway Company*, 445 F.2d 619 (6th Cir.1971), *cert. denied*, 404 U.S. 1017, 92 S.Ct. 678, 30 L.Ed.2d 665 (1972). The difference is in the degree of prejudice to the opposing party in constructing its case around the false answers, and the injury to the fact-finding process from the resulting inability to reconstruct accurate proofs in the midst of trial. The Committee was severely prejudiced, not only by the false information, but also by its late revelation. The major part of the Committee's case involved Wrotslavsky's calculations in Exhibit 28, based on the "regular hours worked", which could only be provided by U.S. Truck. The inaccuracy of U.S. Truck's interrogatory answers increased the amount of the Committee's claim for lost wages

and benefits; U.S. Truck's recalculation of the lost wages, Defendant's Exhibit DD, would reduce the claim.

The Committee contends that in the circumstances, the Court should reject U.S. Truck's calculations and should hold it to its initial interrogatory answers. U.S. Truck contends that the prejudice to the Committee was insubstantial because it provided the recalculations at its own expense.

On balance, the Court concludes that the employees' claims should be fixed in accordance with the true facts. Because nothing suggests that the debtor's recalculations are inaccurate, with one exception which the Court has corrected, the Court will fix the employees' claims according to the debtor's recalculations in Exhibit DD, as corrected.[11] The Court's findings are stated in Appendix A. (*See* Finding of Fact 36.)

■ This does not mean that the prejudice suffered by the Committee as a result of the debtor's false answers to the interrogatories must remain unremedied. No doubt the Committee's attorneys and accountant expended substantial time and effort, unnecessarily, in addressing the issue of the false answers when it was raised. The same is true for the Court.

In the circumstances, the Court concludes that it is appropriate to impose a monetary sanction against the debtor, designed to serve two purposes—first, to compensate for these unnecessary expenditures of time and effort, and second to discourage such conduct. The Court will hold a hearing concerning the amount of the sanction to be imposed.

■ Concerning the claim for lost vacation, sick, and holiday pay, however, the only calculations in evidence are the Committee's in Plaintiff's Exhibit 28.[12] Accord-

---

**11.** For several employees, Defendant's Exhibit DD states a different "actual rate of pay" than Plaintiff's Exhibit 28. There was no foundation laid for any such changes in rate of pay. For these employees, the Court has recalculated the lost wages, once again, using the corrected hours and the rates from Exhibit 28.

The employees whose lost wages were recalculated by the Court are indicated with an asterisk on Appendix A.

**12.** U.S. Truck submitted calculations for this in its proposed findings of fact and conclusions of law at tab C, but these calculations were not offered into evidence.

ingly, the Court finds that Plaintiff's Exhibit 28 is the most accurate evidence available relating to the damages for these lost benefits.

15. *The Committee's Claim for Lost Vacation Pay Is Not Barred by an Employee's Failure to Take Vacation Time Off.*

 U.S. Truck argues that under the rejected agreement, employees received vacation pay only if they took the vacation. Thus, it reasons, employees were not damaged by the loss of vacation pay and vacations they did not take, and that employees presumably worked and were paid for the weeks in which they would have taken a vacation.

The Court rejects this argument. The question is not what an employee would have done with the vacation time nor what amount of money would have been paid to the employee. Rather, the key fact is that the employees lost a benefit—the opportunity to take a week's paid vacation. That benefit has a value above the opportunity to work for pay for a week. The Court concludes that the value of this lost benefit is the value the parties placed on it in the rejected agreement, and that these claims would be enforceable under 29 U.S.C. § 185. Accordingly, these portions of the Committee's claim are allowed.[13]

16. *The Over-the-Road Drivers Who Were Required to Acquire Truck-Tractors in Violation of the Rejected Contract Are Entitled to Damages.*

 Shortly after January 11, 1983, U.S. Truck gave its over-the-road drivers a one-time choice of transferring to a limited number of city driver jobs, becoming owner-operators, or accepting indefinite layoff. Although the city driver jobs were considered inferior to over-the-road jobs and held no guarantee against layoff, the highest seniority drivers could bid on them until the jobs were filled. Drivers with less seniority chose between owner-operator status and layoff. Drivers who chose an indefinite layoff in these circumstances, however, could not anticipate being recalled to their former job because their entire job classification was eliminated.

Clearly, U.S. Truck had a right under the rejected agreement to lay off over-the-road drivers as a result of curtailing its operations. The Court concludes, however, that the wholesale conversion of U.S. Truck's entire over-the-road trucking operation to an owner-operator system amounted to requiring its employees to purchase a tractor as a condition of continued employment. The Court finds that the employees were protected from such action under the rejected agreement. (*See* Finding of Fact 48).

Accordingly, the Court finds that the over-the-road drivers have an enforceable claim for the difference between the amount they were to be paid according to the rejected agreement and the amount they were in fact paid.

17. *The Committee's Calculations of the Over-the-Road Drivers' Damages Are Reasonably Accurate.*

 Through Wrotslavsky, the Committee presented Exhibit 29, which sought to establish the drivers' lost wages for 1983 and 1984 as follows: Column 1 showed the total amount of compensation actually received; column 2 showed the amounts that the employees paid to U.S. Truck in connection with tractor ownership (e.g., tractor payments, fuel charges); column 3 showed the expenses that the employees paid to others as owner-operators (e.g., outside bills for parts); column 4 showed total expenses (the sum of columns 2 and 3); column 5 showed the net pre-tax profit or loss (column 1 less column 4); column 6 showed the estimated number of miles driven that year, which was calculated by dividing the total compensation (column 1) by an average compensation rate of 63 cents per mile; column 7 showed the estimated compensation due under the rejected agreement for those miles driven (column 6 multiplied by 32 cents per mile); column 8 showed the

13. To the extent that the debtor makes a similar argument with respect to sick time and holiday time, it is likewise rejected.

employee's claim under the contract (column 7 less column 5).

Wrotslavsky derived these numbers from various sources. The compensation received (column 1) and the amounts paid by employees to U.S. Truck (column 2) came from U.S. Truck's answers to interrogatories.

To calculate the expenses paid to others (column 3), Wrotslavsky started with the total truck expenses from the federal tax returns of six drivers. He then calculated a ratio of expenses to receipts of 62.83% for 1983 and 62.01% for 1984, and used this ratio to project the total expenses of the other 13 drivers. Finally, he subtracted the expenses paid to U.S. Truck (column 2) from the total expenses to determine the expenses paid to others in column 3. The Court concludes that this method of calculating the drivers' total expenses (column 4) and the net pre-tax profit (column 5) is reasonably accurate in the circumstances.

The uncontroverted evidence from the drivers further establishes that the average mileage compensation of 63 cents per mile, used to determine the estimated miles driven (column 6), is also reasonably accurate.

As noted, the compensation under the rejected agreement (column 7) is calculated by multiplying the miles driven by the rejected contract rate of 32 cents per mile; this is likewise appropriate.

Finally, the calculation of the claim (column 8), by subtracting the net pre-tax profit or loss (column 5) from the amount due under the rejected agreement (column 7), is proper.

18. *The Debtor's Challenges to the Committee's Calculations of the Over-the-Road Drivers' Claims Are Without Merit.*

The Court has carefully considered the debtor's challenges to these calculations and concludes that they are without merit.

U.S. Truck contends that the leases of the truck-tractors from GLS Leasco to the drivers were actually conditional sales contracts under applicable IRS regulations, and that therefore the calculations should have accounted for the benefit the drivers received in building up equity in their tractors. Wrotslavsky testified that his treatment of these lease payments was consistent with Standard 13 of Financial Accounting Standards Board, concerning operating leases and capital leases.

The Court concludes that the tax regulation is not the most appropriate standard here. In the absence of testimony that the Standards of Financial Accounting Standards Board prohibit the expensing of these lease payments, the Court accepts Wrotslavsky's testimony.

Additional contingencies in Exhibit 29 appear to roughly balance out or favor U.S. Truck. U.S. Truck contends that the two mileage rates (columns 6 and 7) are speculative. However, the Court notes that these mileage rates (67 and 32 cents, respectively) are near the bottom of the mileage rate ranges under the new agreement and the rejected agreement, and that the use of these mileage rates is consistent with the drivers' testimony that many light loads were driven.

U.S. Truck further contends that the calculation of the miles driven (column 6) assumed that total compensation was a function of miles driven times the mileage rate, when actually it includes various flat fees for pick-ups and deliveries. The Court notes that under the new system, the mileage rates were higher, while the flat compensation for pick ups and deliveries was lower. Thus, the mileage assumption favors U.S. Truck.

In addition, the Court notes that Exhibit 29 does not include any calculation for the loss of seniority rights, the loss of a guaranteed minimum hourly rate, or the loss of the guaranteed eight hours pay. Also, although the owner-operators would be entitled to a similar claim for the first quarter of 1985, coinciding with the term of the collective bargaining agreement, Exhibit 29 includes no damages for 1985.

Finally, the fringe benefit calculations to some degree favor U.S. Truck. The only eligibility requirement for paid holidays under the collective bargaining agreement was that the driver must work the day

before the holiday. Exhibit 29 however assumed a requirement that the employee first earn $20,000 for that year before taking holidays or sick days. Under the rejected agreement, vacation pay was pro-rated from an employee's average pay. Exhibit 29, however, calculated it at the minimum hourly rate, which would be a minimum for the employee's average pay.

The Court concludes that such complex calculations, while necessarily somewhat contrived, do not overstate the value of the Committee's claim, and most likely understate it. See Laborers Clean-Up Contract Administration Trust Fund v. Uriarte Clean-Up Service, 736 F.2d 516, 521 (9th Cir.1984); Mo-Kan Teamsters Pension Fund v. Creason, 716 F.2d 772, 777–78 (10th Cir.1983), cert. denied, 464 U.S. 1045, 104 S.Ct. 716, 79 L.Ed.2d 178 (1984); Heheman v. E.W. Scripps Co., 661 F.2d 1115, 1126 (6th Cir.1981), cert. denied, 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982); and United Brotherhood of Carpenters, Local 379 v. Day & Zimmerman, Inc., 531 F.Supp. 696, 700 (E.D.Tex.1982).

Therefore, the Court concludes that the total losses calculated in Exhibit 29 are reasonably accurate and the debtor's objections to the calculations must be rejected.

19. *Four Local Unions Are Entitled to Damages For the Debtor's Violation of the Dues Checkoff Provision of the Rejected Agreement.*

The Committee presented evidence on behalf of four local unions for lost membership dues. The Committee argues that U.S. Truck was obligated under the rejected agreement to check off dues, i.e., to deduct dues from actively working union members' paychecks, and remit them to the appropriate local unions.

U.S. Truck argues that it did not deduct or retain any dues, and thus does not owe the local unions any outstanding monies. It further contends that the obligation to pay union dues is the employees', and that therefore requiring U.S. Truck to pay union dues as well as the employees' full paycheck would result in a windfall to the employees who did not pay their own dues and a windfall to the local unions when the employees have already paid their own dues.

The Court agrees that the primary obligation to pay union dues rests with the employees. Where proper union security provisions apply, the dues checkoff is primarily an administrative mechanism for collection. See 2 C. Morris, *The Developing Labor Law*, 1406–1408 (2d ed., 2d printing, 1983). The Committee, however, is not claiming union dues as a direct obligation owed by U.S. Truck, but as a contractual damage claim. Accordingly, the question is whether U.S. Truck had a legally enforceable duty to deduct dues under the rejected agreement, and what measure of damages is appropriate under 29 U.S.C. § 185.

An employer's failure to deduct dues in violation of a contract is a matter of direct and peculiar concern to a labor organization and is within the jurisdiction of the federal courts. *United Mine Workers of America, District 22 v. Roncco*, 314 F.2d 186 (10th Cir.1963). Where a local union has developed a reliance on the dues checkoff, the checkoff mechanism can effectively be its financial lifeline. Accordingly, federal courts have enforced legal dues checkoffs under 29 U.S.C. § 185. See, e.g., *International Brotherhood of Electrical Workers Local No. 12 v. A–1 Electric Service, Inc.*, 535 F.2d 1 (10th Cir.1976), cert. denied, 429 U.S. 832, 97 S.Ct. 94, 50 L.Ed.2d 96 (1976); *Food Handlers Loc. 425 v. Valmac Industries, Inc.*, 528 F.2d 217 (8th Cir.1975); *Local 127, United Shoe Workers of America v. Brooks Shoe Manufacturing Company*, 298 F.2d 277 (3rd Cir.1962); *Bugher v. Consolidated X–Ray Service Corp.*, 515 F.Supp. 1180 (N.D.Tex. 1981), aff'd, 705 F.2d 1426 (5th Cir.1983), cert. denied, 473 U.S. 904, 105 S.Ct. 3524, 87 L.Ed.2d 650 (1985).

A review of the union security and checkoff provisions of the collective bargaining agreement indicates that they are clear and mandatory, and the Court con-

cludes that the dues checkoff obligation is enforceable. *See* Finding of Fact 52.

 The Committee claims damages in an amount equal to the full amount of dues which U.S. Truck did not deduct for union member employees who were actively working. The Committee's records provide a monthly measure of these lost dues for the duration of the rejected agreement. The Court concludes that this measure of damages is consistent with that used under 29 U.S.C. § 185. *See Bugher,* 515 F.Supp. at 1183; *Amalgamated Meat Cutters and Allied Workers of North America, Local 593 v. Shen-Mar Food Products, Inc.,* 405 F.Supp. 1122 (W.D.Va.1975); *Murtha v. Pet Dairy Products Co.,* 44 Tenn.App. 460, 314 S.W.2d 185 (1958). Accordingly, the Court finds that the portion of the Committee's claim on behalf of the local unions should be allowed as set forth in Findings 54–57.

### IV. *Conclusion*

In conclusion, the Court determines that the Committee's claim is allowable as follows:

The claim on behalf of Hazel Long, Helen Suszek and Joann Drew is disallowed.

The claim on behalf of the following office employees is allowed in the following amounts: [14]

| | |
|---|---:|
| Gloria Gonzalez | $ 44,116.39 |
| Dorothy Zatkovich | 48,134.64 |
| Betty Watkins | 41,517.40 |
| Henry Stys | 15,609.87 |
| Joan Baker | 29,523.52 |
| Patricia Mendez | 12,609.09 |
| Total | $191,510.91 |

The claim on behalf of 115 hourly employees is allowed as set forth in Appendix A attached hereto. The total allowed amount for hourly employees is $801,-802.76.

The claim on behalf of 19 over-the-road drivers is allowed as set forth in Appendix B attached hereto. The total amount of the claim allowed for the over-the-road drivers is $520,720.08.

The claim on behalf of the local unions is allowed as follows:

| | |
|---|---:|
| Local Union 164 | $ 1,809 |
| Local Union 299 | 36,998 |
| Local Union 406 | 2,650 |
| Local Union 486 | 1,205 |
| Total | $42,662 |

Wherefore, the Committee's claim is allowed in the amount of $1,556,695.75.

### Appendix A – Losses of Hourly Employees

| Name | Lost Wages (Regular & Overtime) | Lost Vacation Pay | Lost Sick Day & Holiday Pay | Total Allowed Amounts of Claims |
|---|---:|---:|---:|---:|
| H. Tomaszewski | 1,151.35 | 0.00 | 0.00 | 1,151.35 |
| C. Elkins | 127.41 | 0.00 | 0.00 | 127.41 |
| B. Ramsey | 2,058.07 | 0.00 | 0.00 | 2,058.07 |
| R. Laurel | 5,202.91 | 4,852.80 | 1,725.44 | 11,781.15 |
| P. Dolan* | 4,215.21 | 2,426.40 | 862.72 | 7,504.33 |
| J. Thiesmeyer | 5,420.60 | 4,852.80 | 1,725.44 | 11,998.84 |
| G. Fitgerald | 3,811.47 | 1,206.90 | 858.24 | 5,876.61 |
| N. Michelin | 7,059.30 | 3,620.70 | 1,716.48 | 12,396.48 |
| J. McBain | 6,589.97 | 4,827.60 | 1,716.48 | 13,134.05 |
| H. Mathis | 6,884.59 | 4,827.60 | 1,716.48 | 13,428.67 |
| J. Miesik | 8,936.47 | 4,827.60 | 1,716.48 | 15,480.55 |
| E. Mattingly | 4,900.56 | 1,810.35 | 858.24 | 7,569.15 |
| W. Donahue | 7,321.12 | 4,791.60 | 1,703.68 | 13,816.40 |
| N. Martin | 8,147.87 | 4,827.60 | 1,716.48 | 14,691.95 |

* See footnote 11, above.

**14.** The allowance of these claims is without prejudice to the Committee's right to move to reconsider, if any state agency which administers unemployment benefits seeks to recoup any amounts of such unemployment benefits, (*see NLRB v. Gullett Gin Co.,* 340 U.S. 361, 71 S.Ct. 337, 95 L.Ed. 337 (1951)), based on allowance of this claim in bankruptcy.

Appendix A – Losses of Hourly Employees

| Name | Lost Wages (Regular & Overtime) | Lost Vacation Pay | Lost Sick Day & Holiday Pay | Total Allowed Amounts of Claims |
|---|---|---|---|---|
| J. Cudejko | 5,903.89 | 4,827.60 | 1,716.48 | 12,447.97 |
| E. Clarkson | 6,820.01 | 4,791.60 | 1,703.68 | 13,315.29 |
| H. Gardner | 4,916.25 | 4,795.20 | 1,704.96 | 11,416.41 |
| D. Baker | 4,986.20 | 2,395.80 | 851.84 | 8,233.84 |
| C. Cain | 6,591.85 | 4,791.60 | 1,703.68 | 13,087.13 |
| J. Mussell | 4,552.04 | 1,798.20 | 852.48 | 7,202.72 |
| J. White | 2,170.14 | 0.00 | 0.00 | 2,170.14 |
| D. Ritthaler | 5,958.57 | 4,852.80 | 1,725.44 | 12,536.81 |
| H. Risinger* | 1,548.62 | 0.00 | 0.00 | 1,548.62 |
| K. Hamilton | 7,394.30 | 4,827.60 | 1,716.48 | 13,938.38 |
| L. Riesner | 5,029.70 | 1,206.90 | 858.24 | 7,094.84 |
| W. Riley | 6,808.44 | 2,413.80 | 858.24 | 10,080.48 |
| R. Robine | 588.77 | 0.00 | 0.00 | 588.77 |
| R. Shay | 3,771.11 | 1,206.90 | 858.24 | 5,836.25 |
| W. Curtis | 7,512.55 | 4,827.60 | 1,716.48 | 14,056.63 |
| L. Turnbull | 5,770.04 | 4,827.60 | 1,716.48 | 12,314.12 |
| E. Renaud | 6,075.34 | 4,952.80 | 1,725.44 | 12,753.58 |
| J. Pack | 2,581.25 | 0.00 | 0.00 | 2,581.25 |
| D. Laswell* | 7,007.85 | 4,852.80 | 1,725.44 | 13,586.09 |
| P. Kaluzovski* | 5,101.31 | 1,213.20 | 862.72 | 7,177.23 |
| J. Caudill | 5,619.23 | 1,819.80 | 862.72 | 8,301.75 |
| L. Cain* | 5,234.63 | 2,426.40 | 862.72 | 8,523.75 |
| C. Shaffier | 8,894.33 | 4,852.80 | 1,725.44 | 15,472.57 |
| C. Partin | 7,064.25 | 4,852.80 | 1,725.44 | 13,642.49 |
| T. Knuckles | 2,061.97 | 0.00 | 0.00 | 2,061.97 |
| E. Bliznik | 5,304.52 | 1,213.20 | 862.72 | 7,380.44 |
| R. Pearce | 8,360.94 | 4,827.60 | 1,716.48 | 14,905.02 |
| E. Reading | 6,891.81 | 2,413.80 | 1,716.48 | 11,022.09 |
| L. Woodward | 5,922.65 | 2,413.80 | 858.24 | 9,194.69 |
| R. Brown | 7,128.15 | 2,413.80 | 1,716.48 | 11,258.43 |
| J. Miller (Jacob)* | 6,376.47 | 1,810.35 | 858.24 | 9,045.06 |
| G. Champagne | 134.67 | 0.00 | 0.00 | 134.67 |
| D. Nichols | 2,221.46 | 0.00 | 0.00 | 2,221.46 |
| R. Nardone | 5,189.50 | 1,206.90 | 858.24 | 7,254.64 |
| C. LaMacchia | 5,732.21 | 1,798.20 | 852.48 | 8,382.89 |
| G. Knight | 2,127.51 | 2,397.60 | 852.48 | 5,377.59 |
| K. Garland | 7,975.97 | 4,795.20 | 1,704.96 | 14,476.13 |
| W. Johnson | 5,399.87 | 1,198.80 | 852.48 | 7,451.15 |
| C. Ballard | 3,746.57 | 1,798.20 | 852.48 | 6,397.25 |
| E. O'Hearn | 7,738.30 | 4,795.20 | 1,704.96 | 14,238.46 |
| F. Luft | 6,906.73 | 3,596.40 | 1,704.96 | 12,208.09 |
| M. Reeves | 0.00 | 0.00 | 0.00 | 0.00 |
| T. Burkwalt | 3,187.67 | 1,198.80 | 852.48 | 5,238.95 |
| J. Ross | 8,683.14 | 4,795.20 | 1,704.96 | 15,183.30 |
| R. Husted | 6,191.90 | 1,798.20 | 852.48 | 8,842.58 |
| J. Fuson | 5,048.81 | 1,206.90 | 858.24 | 7,113.95 |
| K. Orr | 5,819.46 | 1,810.35 | 858.24 | 8,488.05 |
| L. Kuzenko | 3,676.90 | 1,198.80 | 852.48 | 5,728.18 |
| H. Wilson | 6,068.54 | 1,810.35 | 858.24 | 8,737.13 |
| W. Davis* | 8,801.12 | 4,827.60 | 1,716.48 | 15,345.20 |
| O. Woodcock* | 8,756.74 | 4,827.60 | 1,716.48 | 15,300.82 |
| R. Parrish* | 6,813.91 | 4,795.20 | 1,704.96 | 13,314.07 |

### Appendix A – Losses of Hourly Employees

| Name | Lost Wages (Regular & Overtime) | Lost Vacation Pay | Lost Sick Day & Holiday Pay | Total Allowed Amounts of Claims |
|---|---|---|---|---|
| J. Davis | 6,540.85 | 3,593.70 | 1,703.68 | 11,838.23 |
| R. Cummings | 5,988.43 | 3,593.70 | 1,703.68 | 11,285.81 |
| V. Moore* | 6,717.19 | 4,795.20 | 1,704.96 | 13,217.35 |
| J. Miller (Joseph) | 8,496.78 | 4,827.60 | 1,716.48 | 15,040.86 |
| S. Leszczynski* | 4,162.55 | 2,413.80 | 1,716.48 | 8,292.83 |
| R. Tuttle* | 4,437.92 | 1,206.90 | 858.24 | 6,503.06 |
| R. Alleman | 5,795.95 | 3,596.40 | 1,704.96 | 11,097.31 |
| C. Warren* | 5,155.36 | 1,810.35 | 858.24 | 7,823.95 |
| R. Kolasinski | 3,914.14 | 603.45 | 858.24 | 5,375.83 |
| M. Luxton | 4,263.89 | 603.45 | 858.24 | 5,725.58 |
| C. Trantham | 4,771.08 | 1,810.35 | 858.24 | 7,439.67 |
| J. Dunn | 71.77 | 0.00 | 0.00 | 71.77 |
| C. Starch | 177.79 | 0.00 | 0.00 | 177.79 |
| R. Crouch* | 585.31 | 0.00 | 0.00 | 585.31 |
| G. Francis | 706.52 | 0.00 | 0.00 | 706.52 |
| C. Knaebel | 2,228.60 | 1,798.20 | 852.48 | 4,879.28 |
| D. Maitland | 838.17 | 0.00 | 0.00 | 838.17 |
| F. Plowman | 2,068.79 | 2,413.80 | 858.24 | 5,340.83 |
| T. West | 1,105.34 | 0.00 | 0.00 | 1,105.34 |
| R. Williams | 2,460.08 | 2,413.80 | 858.24 | 5,732.12 |
| J. Adams | 1,917.38 | 2,413.80 | 858.24 | 5,189.42 |
| D. Ankney | 949.69 | 0.00 | 0.00 | 949.69 |
| R. Barrett | 6,572.19 | 4,795.20 | 1,704.96 | 13,072.35 |
| J. Beeman | 6,400.35 | 603.45 | 858.24 | 7,862.04 |
| E. Butler | 2,633.10 | 2,413.80 | 858.24 | 5,905.14 |
| A. Crane | 565.32 | 0.00 | 0.00 | 565.32 |
| G. Hamilton | 1,151.88 | 0.00 | 0.00 | 1,151.88 |
| D. Emard | 40.94 | 0.00 | 0.00 | 40.94 |
| E. Herrick | 1,315.94 | 0.00 | 0.00 | 1,315.94 |
| S. Dargis | 3,359.55 | 1,206.90 | 858.24 | 5,424.69 |
| E. Howey | 2,139.22 | 2,397.60 | 852.48 | 5,389.30 |
| R. Jewett | 9.69 | 0.00 | 0.00 | 9.69 |
| D. Johnston | 5,399.87 | 0.00 | 0.00 | 5,399.87 |
| L. Kelly | 3,161.56 | 1,798.20 | 852.48 | 5,812.24 |
| J. Rosinski | 569.67 | 0.00 | 0.00 | 569.67 |
| D. Lee | 244.89 | 0.00 | 0.00 | 244.89 |
| T. Lobzun | 795.63 | 0.00 | 0.00 | 795.63 |
| P. Meissner | 85.76 | 0.00 | 0.00 | 85.76 |
| R. Popma | 10.00 | 0.00 | 0.00 | 10.00 |
| R. Petrie | 449.41 | 0.00 | 0.00 | 449.41 |
| J. Siereveld | 55.47 | 0.00 | 0.00 | 55.47 |
| C. Klapp | 14.69 | 0.00 | 0.00 | 14.69 |
| W. Larson | 61.72 | 0.00 | 0.00 | 61.72 |
| G. Reginik | 30.78 | 0.00 | 0.00 | 30.78 |
| M. Ridenour | 99.50 | 0.00 | 0.00 | 99.50 |
| M. Warsow | 122.45 | 0.00 | 0.00 | 122.45 |
| V. Schultz | 59.69 | 0.00 | 0.00 | 59.69 |
| A. Johns | 43.20 | 0.00 | 0.00 | 43.20 |
| J. Scott | 6,225.32 | 4,827.60 | 1,716.48 | 12,769.40 |
| Totals | | | | $801,802.76 |

Appendix B – Losses of Over-the-Road Drivers

| Name | 1983 Wages | 1984 Wages | 1983–84 Vacations | 1983–84 Sickpay & Holidays | Allowed Amounts of Claims |
|---|---|---|---|---|---|
| C. Ewing | 10,297.00 | 19,100.00 | 5,711.04 | 1,692.16 | 36,800.20 |
| K. Gearhart | 6,841.00 | 21,102.00 | 1,903.68 | 1,692.16 | 31,538.84 |
| W. Huston | 5,480.00 | 19,567.00 | 1,903.68 | 1,692.16 | 28,642.84 |
| C. Benson | 15,841.00 | 24,170.00 | 4,441.92 | 1,692.16 | 46,145.08 |
| A. Bassinger | 6,956.00 | 20,022.00 | 1,903.68 | 1,692.16 | 30,573.84 |
| G. Silvernail | 4,306.00 | 21,851.00 | 1,903.68 | 1,692.16 | 29,752.84 |
| J. Mathison | 7,271.00 | 19,172.00 | 1,903.68 | 1,692.16 | 30,038.84 |
| J. Hale | 0.00 | 20,075.00 | 3,172.80 | 1,692.16 | 24,939.96 |
| F. Howard | 7,585.00 | 20,699.00 | 1,903.68 | 1,692.16 | 31,879.84 |
| D. Diehr | 7,590.00 | 19,748.00 | 3,172.80 | 1,692.16 | 32,202.96 |
| J. Bundy | 3,356.00 | 4,977.00 | 634.56 | 846.08 | 9,813.64 |
| E. McBrayer | 8,215.00 | 23,607.00 | 3,172.80 | 1,692.16 | 36,686.96 |
| R. Calhoun | 6,812.00 | 12,857.00 | 1,903.68 | 1,692.16 | 23,264.84 |
| T. Rhoniy | 2,448.00 | 2,676.00 | 1,269.12 | 846.08 | 7,239.20 |
| D. Holston | 5,984.00 | 16,532.00 | 1,903.68 | 1,692.16 | 26,111.84 |
| D. Foster | 7,339.00 | 14,329.00 | 4,441.92 | 1,692.16 | 27,802.08 |
| A. Sales | 875.00 | 0.00 | 0.00 | 0.00 | 875.00 |
| S. Ignasiak | 7,926.00 | 24,405.00 | 4,441.92 | 1,692.16 | 38,465.08 |
| B. Pawlowski | 2,206.00 | 18,337.00 | 5,711.04 | 1,692.16 | 27,946.20 |
| Total | | | | | $520,720.08 |